Patricia Ann Thomas JACKSON, Petitioner–Appellee, Cross–Appellant,

v.

Tommy HERRING, Respondent–Appellant, Cross–Appellee.

No. 91–7185.

United States Court of Appeals, Eleventh Circuit.

Jan. 9, 1995.

Rodger K. Brannum, Deputy Atty. Gen., Andy S. Poole, Asst. Atty. Gen., Montgomery, AL, for appellant.

LaJuana S. Davis, Bryan A. Stevenson, Alabama Capital Representation Resource Center, Montgomery, AL, for appellee.

Before KRAVITCH, HATCHETT and ANDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

Patricia Ann Thomas Jackson, an Alabama prison inmate, was convicted in 1981 of murdering a neighbor during an argument. She was sentenced to death. After exhausting direct appeals and collateral attacks, Jackson filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Alabama pursuant to 28 U.S.C. § 2254 (1988), challenging her conviction and death sentence.

The district court granted habeas relief on the conviction and, alternatively, on the sentence. *Jackson v. Thigpen,* 752 F.Supp. 1551 (N.D.Ala.1990). The court held that the jury that convicted Jackson was unconstitutionally comprised because the prosecution used its peremptory challenges to exclude all blacks from service on her jury, in violation of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). *Id.* at 1554–55, 1562. The court further held that Jackson overcame her procedural default on this claim by showing that counsel was ineffective for failing to object at trial, and by showing prejudice from this error. The court also held that Jackson was entitled to guilt phase relief on the alternative independent ground of her counsels' ineffectiveness at trial for failure to object to the prosecutor's use of peremptory strikes. *Id.*

The court thus granted guilt phase habeas relief on both grounds. *Id.* at 1561–62. The court additionally granted relief on Jackson's claim that her counsel was constitutionally ineffective at sentencing phase for failing to present any mitigating evidence. *Id.* at 1562. Accordingly, the court ordered that Jackson's conviction and sentence be set aside. The State of Alabama appeals from the district court's grant of habeas corpus relief. Jackson cross-appeals the district court's denial of habeas corpus relief on alternate grounds involving other asserted constitutional violations at sentencing.

For the reasons that follow, we REVERSE the ruling of the district court as to Jackson's substantive claim under *Swain,* because Jackson has not overcome her procedural default; we REVERSE the ruling of the district court as to ineffective assistance of counsel at guilt phase, because this claim, too, is defaulted; we AFFIRM the ruling of the district court as to ineffective assistance of counsel at sentencing phase and we AFFIRM the district court's denial of relief as to the grounds raised on cross-appeal.

I.

The facts of Jackson's crime have been recounted by the decisions of the Alabama state courts, and require only brief summary.[1] On February 28, 1981, in the early afternoon, Patricia Ann Thomas Jackson

1. *See Jackson v. State,* 501 So.2d 542 (Ala.Crim. App.1986), *review denied,* No. 86–269 (1987); *Jackson v. State,* 459 So.2d 963 (Ala.Crim.App.), *aff'd, Ex Parte Jackson,* 459 So.2d 969 (Ala.1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985).

stabbed Bonnie Walker during or immediately after an argument. The confrontation apparently arose out of a dispute over liquor that Jackson wished to purchase from Walker. At first, Jackson yelled at and cursed Walker from the street in front of Walker's home. A shouting match ensued, and after a brief interruption in the argument, during which Jackson left and then returned, the confrontation resumed. Jackson testified at trial that Walker was at this time armed with a knife and threatening her; two witnesses at trial, however, testified that Walker was unarmed. After further argument, Jackson stabbed Walker in the chest. Jackson left the scene immediately, and Walker went inside her home.

Walker quickly reappeared, covered with blood and holding a knife, and yelled that Jackson had "cut" her. Her friends came to her aid and led her back into her home. Paramedics were called to the scene, but Walker's wound proved fatal. Jackson voluntarily surrendered to the police the next day. Because this case involves the discriminatory use of peremptory strikes, we note that Jackson is black, as was Walker.

■ A Tuscaloosa County grand jury charged Jackson by indictment with "murder committed by a defendant who has been convicted of murder in the first or second degree in the 20 years preceding the crime," based on her 1966 guilty plea to second-degree murder. In the present case, Jackson was represented at both trial and sentencing by two co-counsel, Ralph Burroughs and Joel Sogol.[2] The attorneys have testified that Burroughs was to be responsible for conducting the trial and Sogol was to assist him and prepare for any appeal. During jury selection, the Tuscaloosa County prosecutor, Gerald Hudson, used his 22 peremptory strikes to exclude all twelve black people, along with ten white people, who were qualified for jury service. The defense did not object to these strikes. On December 16, 1981, the all-white jury returned a verdict of guilty on that charge. On the same day, the court held a separate sentencing phase hearing, so that the jury might recommend Jackson's punishment.[3] At this hearing, Jackson's trial counsel presented no mitigating evidence. The only evidence introduced was the stipulation that Jackson was 33 years old. The jury recommended that Jackson's punishment be set at death.

At two brief sentencing hearings held before the court over the next week, Jackson's counsel again declined the opportunity to present mitigating evidence. The trial court sentenced Jackson to death by electrocution.

Jackson raised three claims on direct appeal, none of which are raised herein. Her conviction was affirmed on direct appeal by the Alabama Court of Criminal Appeals and the Alabama Supreme Court. *Jackson v. State,* 459 So.2d 963 (Ala.Crim.App.), *aff'd, Ex Parte Jackson,* 459 So.2d 969 (Ala.1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985).

In April 1985, Jackson filed a petition in the trial court for writ of error coram nobis. One of her several arguments was that her trial counsels' failure to prepare for or present any evidence at the sentencing phase of her trial constituted ineffective assistance of counsel.[4] She did not argue that her counsel was ineffective for having failed to object to the prosecution's use of peremptories. After an evidentiary hearing at which both Sogol and Burroughs testified, the coram nobis court denied relief. The Alabama Court of Criminal Appeals affirmed. *Jackson v. State,* 501 So.2d 542, 550–51 (Ala.Crim.App. 1986), *review denied,* No. 86–269 (Ala.1987).

---

**2.** The district court's published opinion, 752 F.Supp. 1551, misnames Mr. Sogol throughout as "Sokol."

**3.** Under Alabama law, the trial of a capital case is bifurcated into separate guilt and penalty phases. After a defendant is convicted of a capital offense, the jury is presented with further evidence and must *recommend* a sentence of either life imprisonment or imposition of death. The judge, however, makes the final determination. The parties alternatively may consent to waive the jury and have the judge determine the sentence without a jury recommendation.

**4.** Jackson's trial counsel withdrew during the coram nobis stage to enable new counsel, attorney Walter Bramwell, to raise the additional ground of ineffectiveness of trial counsel.

Jackson filed this petition for a writ of habeas corpus in federal district court in 1987. For the first time, she alleged that the prosecutor in her case unconstitutionally and pursuant to a systematic practice used his peremptory challenges to exclude black citizens from her petit jury, in violation of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and that her counsels' ineffectiveness in failing to object at trial constituted cause sufficient to overcome her procedural default on this claim and that she suffered prejudice due to her counsels' error. She also alleged for the first time that her counsels' ineffectiveness for failing to object to the prosecutor's use of peremptories constituted an independent ground requiring habeas corpus relief. Further, Jackson realleged that her counsel was constitutionally ineffective for having failed to investigate or present mitigating evidence at the sentencing phase of her trial. Pursuant to 28 U.S.C. § 2254(a), the district court held an evidentiary hearing on both claims.

The district court found that Jackson had demonstrated that the prosecutor's use of peremptory strikes to consistently exclude blacks, including at Jackson's trial, violated Jackson's equal protection rights under *Swain*. 752 F.Supp. at 1554–55, 1562. As to this claim, the court further held that Jackson had overcome her procedural default on the *Swain* claim by demonstrating that her counsel was ineffective for having failed to object at trial, and by demonstrating prejudice arising from that error. *Id.* at 1559–60, 1562. The court also held that Jackson had alleged a valid, independent claim of ineffective assistance based on counsels' failure to object to the prosecution's use of peremptories; the court held that this claim was not procedurally barred, reasoning that Jackson had alleged other ineffective assistance grounds in state court, and "[a] federal *habeas* petitioner is not required to present in state court *every* basis for a claim that counsel is ineffective." *Id.* at 1560 n. 10 and 1561–62. The court alternatively held that Jackson's counsel was ineffective for failing to present mitigating evidence at sentencing. *Id.* at 1562. In accordance with these rulings, the district court granted habeas relief

and ordered that Jackson's conviction and sentence be set aside without prejudice.

## II.

Because Jackson's ineffective assistance of counsel claim was asserted not only as an independent basis of habeas relief but also as cause for failing to raise the underlying *Swain* claim at trial, we must address it before reaching the substantive *Swain* claim.

The district court held, with little discussion, that Jackson's independent claim that her counsel was ineffective for failing to raise a *Swain* objection at trial was not procedurally barred. The court appears to have grounded its holding on the conclusion that "petitioner raised the ineffective assistance claim in her *coram nobis* petition, albeit on other bases. A federal *habeas* petitioner is not required to present in state court *every* basis for a claim that counsel is ineffective." 752 F.Supp. at 1560 n. 10 (emphasis in original) (citing *Brand v. Lewis*, 784 F.2d 1515 (11th Cir.1986)). The district court did not have the benefit of our subsequent opinion in *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir.1992), in which we held that habeas petitioners generally may not raise ineffective assistance of counsel claims except on grounds specifically presented to the state courts. *See also Bolender v. Singletary*, 16 F.3d 1547, 1556 n. 10 (11th Cir.1994). Although Jackson raised several other claims of ineffective assistance before the state court, she did not argue that her counsel was ineffective for failing to object at trial to the prosecutor's discriminatory use of peremptories. Because trial stage ineffectiveness for failure to raise *Swain* was not presented to the state courts, and a sufficient showing of cause and prejudice was not made, we hold that Jackson's independent ineffective assistance of counsel claim is procedurally barred.

## III.

We turn next to the more complex issues concerning Jackson's underlying *Swain* claim. In *Swain v. Alabama*, the Supreme Court addressed, for the first time, the state's use of peremptory challenges in a

racial context. Swain was a black man convicted by an all-white jury in Talladega County, Alabama, of raping a white woman. Swain alleged that the prosecutor's use of peremptory strikes to exclude all blacks from the petit jury violated the Equal Protection Clause. The Supreme Court rejected his challenge, primarily because the record did not "with any acceptable degree of clarity, show when, how often, and under what circumstances the prosecutor alone ha[d] been responsible for striking" blacks from petit jury panels. *Id.* at 224, 85 S.Ct. at 838. *Swain* nonetheless set up a framework for challenging a prosecutor's use of peremptory strikes, which remained the final word on such challenges until the Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), made such claims considerably easier. Because Jackson's trial and appeal occurred before the *Batson* opinion, *Swain* governs this court's review of her claim. *See Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (*Batson* not applied retroactively).

Jackson's venire consisted of eighty-six persons, seventy white and sixteen black. Six whites and four blacks were excused for cause, leaving a remaining venire of sixty-four whites and twelve blacks. The Tuscaloosa County prosecutor, Gerald Hudson, used his twenty-two peremptories to remove all twelve blacks and ten whites. Jackson alleges that the prosecution's wholesale removal of blacks from the jury was undertaken pursuant to a pattern of discriminatory use of peremptory strikes. The district court agreed, and found that "the standard operating procedure of the Tuscaloosa County District Attorney's Office at the time of petitioner's trial was to use the peremptory challenges to strike as many blacks as possible from the venires in cases involving serious crimes." 752 F.Supp. at 1554.

Under *Swain*, prosecutors are cloaked with the presumption that they have used their peremptory strikes for "fair and impartial" reasons. 380 U.S. at 222, 85 S.Ct. at 837. Prosecutors may not, however, "consistently and systematically exercise their strikes to prevent any and all Negroes on petit jury venires from serving on the petit

jury itself." *Id.* at 223, 85 S.Ct. at 837. As we have emphasized in the past, this language describes an "extreme" example of illegal conduct, rather than a "litmus test." *Horton v. Zant*, 941 F.2d 1449, 1454 (11th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992).

In order to overcome the presumption that a prosecutor has exercised his peremptory strikes for unbiased reasons, the petitioner "is not required to show that the prosecutor *always* struck *every* black venireman offered to him ... but the facts must manifestly show an intent on the part of the prosecutor to disenfranchise blacks from traverse juries in criminal trials." *Horton*, 941 F.2d at 1454 (emphasis in original) (citing *Willis v. Zant*, 720 F.2d 1212 (11th Cir.1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3546, 3548, 82 L.Ed.2d 849, 851 (1984)). The petitioner may fulfill her burden "either by coming forward with statistical evidence or by using testimony from individuals who have witnessed the prosecutor's manner of exercising his peremptory strikes." *Horton*, 941 F.2d at 1454–55 (citing *Willis*, 720 F.2d at 1220 n. 18).

At the district court's evidentiary hearing, Jackson presented compelling anecdotal and statistical evidence depicting the systematic exclusion of blacks from Tuscaloosa County juries. *See* 752 F.Supp. at 1554–55. The district court found that:

> [T]he standard operating procedure of the Tuscaloosa County District Attorney's Office at the time of petitioner's trial was to use the peremptory challenges to strike as many blacks as possible from the venires in cases involving serious crimes.
>
> . . . .
>
> The Tuscaloosa County prosecutors also manipulated the trial docket in their effort to preserve the racial purity of criminal juries. [footnote omitted] Inasmuch as they actually set the criminal trial dockets until 1982, they implemented a scheme in which juries with fewer black venirepersons would be called for the serious cases.
>
> The use of peremptory challenges by the Tuscaloosa County District Attorney's Office effectively resulted in the systematic exclusion of blacks from trial juries in seri-

ous criminal cases prior to 1982. [footnote omitted] This systematic exclusion of blacks ... occurred in cases where both the defendant and the alleged victim were black and resulted in the all-white jury that tried petitioner.

*Id.*

■ Overwhelming evidence supports the district court's conclusion that the use of peremptory strikes by the Tuscaloosa County D.A.'s office violated *Swain.* This evidence is thoroughly documented in the district court's opinion. Three defense attorneys, one former prosecutor, and most signif-

icantly, the prosecuting attorney himself, all testified that there was widespread and systematic misuse of peremptories by the Tuscaloosa D.A.'s office.[5] In addition, the statistics presented demonstrate that at the time of Jackson's trial, blacks were approximately two-and-one-half times more likely to be struck than whites, and 65–70% of the Tuscaloosa County juries underrepresented black citizens.[6] We have no doubt that Jackson has sufficiently proven that the prosecution discriminatorily and pursuant to a systematic practice employed its peremptories to exclude all blacks from her jury. *Accord Horton,* 941 F.2d at 1457 (*Swain* claim estab-

5. The prosecutor testified at the district court evidentiary hearing that he struck all blacks from Jackson's venire because he believed that "black people were less receptive to a state's case," and that his case would thus "not be well received by black jurors." Hudson testified that he first adopted this philosophy around 1979 or 1980; as of that time, he was more likely to strike blacks because "everything else being equal ... a black juror would be less likely to give the State a fair trial." Thus, Hudson admitted at the evidentiary hearing that "with that as a preconceived notion, [he] would have had to strike more blacks than whites." And that, he conceded, was precisely what he did at Jackson's trial.

Al Vreeland, an Assistant Tuscaloosa D.A. in 1977–78, testified at the evidentiary hearing that disproportionate peremptory strikes of black persons "occurred almost without exception" during his tenure:
[W]e would routinely, unless there was something in particular known about a particular juror ... strike all the blacks that we could get off the jury .... We would also program and schedule the trial of cases during a jury week so that ... cases that we considered particularly important, generally more serious crimes, would have a venire from which all blacks could be removed....

Ralph Knowles and Richard Thompson, local Tuscaloosa attorneys who had tried many criminal cases in the County, also testified that it was common practice for Tuscaloosa County prosecutors to exclude a disproportionate number of blacks through use of peremptories. Knowles stated that from 1972–78—a period during which he practiced a great deal of criminal law in Tuscaloosa County—there was a tendency to "strik[e] more blacks regardless, unless there was something peculiar about the case which cause[d] the DA to think it would be better to have blacks on that particular case." Similarly, Thompson offered two instances in which the Tuscaloosa County D.A. struck all blacks from the venire; this practice, he testified, "was fairly representative of what has gone on in Tuscaloosa County up until I['d] say '84 or '85." Thompson, however, generally confined his observations of

discrimination in jury selection to cases involving black-on-white or white-on-white crime.

Finally, Ralph Burroughs, Jackson's trial counsel, testified based on his trial of hundreds of cases that systematic strikes of black jurors occurred until the early 1980's. According to Burroughs, the Tuscaloosa County prosecutors would "systematically go[ ] down the line and strik[e] the black people." He stated that the general practice through the early 1980's was that prosecutors would "go right straight through there, everhow many number of strikes they had, and all were black."

6. According to the expert testimony of Dr. Chester T. Palmer:
[T]here can be no reasonable doubt that, both in all cases 1981–85 and in Hudson's cases, there was a pattern that blacks were more likely to be subjected to peremptory strikes by the prosecution than were whites on the same venires. On the average, *in 1981–85 the prosecution used 2.42 more peremptory strikes on black than expected by random selection; in Hudson's case, the comparable figure is 2.58.*
Dr. Robert Sigler presented similar testimony at the district court's hearing. Both experts agreed that the prosecution employed approximately 45% of its peremptory strikes against blacks; Palmer testified that the figure was slightly higher as to Hudson's strikes. Put differently, Tuscaloosa County prosecutors struck approximately 80% more blacks than would be expected by random selection—slightly more in the case of Hudson. The result was that approximately 14.6% of the actual jurors in criminal cases were black—down from about 20.7% on the venires.

This disparity affected the composition of most Tuscaloosa County criminal juries. Both experts agreed that at the time of trial, blacks were underrepresented to some degree on approximately 65–70% of criminal juries in Tuscaloosa County, as compared to their numbers on venire. Palmer testified that there were no blacks at all on 30–35% of criminal juries.

lished where prosecutor struck blacks approximately twice as frequently as whites); *Love v. Jones,* 923 F.2d 816, 820 (11th Cir. 1991) (*Swain* claim established where three attorneys, including trial counsel, testified that they had observed a pattern of intentional discrimination in prosecutor's use of peremptory strikes); *Jones v. Davis,* 835 F.2d 835, 838–39 (11th Cir.1988) (*Swain* violation where six defense attorneys testified that they believed the prosecutor's office systematically struck most blacks from jury venires), *cert. denied,* 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988).

## IV.

■ Under Alabama's "contemporaneous objection rule," because Jackson failed to raise the *Swain* claim at trial, she was thereafter precluded from raising this objection in the state courts, whether on direct appeal or in coram nobis proceedings. *See Pitts v. Cook,* 923 F.2d 1568, 1571 (11th Cir.1991) (under Alabama law, "petitioner's failure to contemporaneously object would have barred consideration of his *Batson* claim on direct review (or otherwise) in the state courts") (citing *Cochran v. State,* 548 So.2d 1062 (Ala. Crim.App.1989)); *see also Jackson,* 501 So.2d at 544 ("Coram nobis is not available to review issues which could have been raised at trial or on direct appeal.") (citing *Ex Parte Ellison,* 410 So.2d 130, 132 (Ala.1982)). Jackson thus procedurally defaulted her right under *Swain* to challenge her prosecutor's use of peremptory strikes.

All is not lost for Jackson, however, if she can demonstrate cause and prejudice for her default under the test of *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506– 07, 53 L.Ed.2d 594 (1977). *Sykes* held that when a habeas petitioner has failed to comply with a state's contemporaneous objection rule, a federal court may review her claim upon a showing of cause for the procedural default and prejudice arising therefrom. *See also Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

Jackson does not dispute that her *Swain* claim is procedurally defaulted, but asserts that cause and prejudice exist to overcome the default. She contends that her counsels' ineffectiveness for not objecting to the peremptory strikes constituted cause for her default, and that her trial and sentencing were intrinsically prejudiced by the pervasive effect of the exclusion of blacks from her jury.

■ In order to constitute cause sufficient to overcome procedural default, a counsel's performance must be *constitutionally* ineffective under the standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Devier v. Zant,* 3 F.3d 1445, 1455 (11th Cir.1993) (petitioner could not use ineffective assistance of counsel as cause for procedural default because he failed to satisfy two-prong *Strickland* test); *Smelcher v. Attorney General of Alabama,* 947 F.2d 1472, 1475 (11th Cir.1991) ("While it is true that ineffective assistance of counsel may be the cause for a default, ... it must first satisfy [the] two-part [*Strickland*] test"). In *Strickland,* the Supreme Court set forth the test for determining whether counsel's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* 466 U.S. at 686, 104 S.Ct. at 2064. This test has two prongs:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. at 2064. We review the performance and prejudice prongs of *Strickland* in turn, and for the reasons set forth below, hold that Jackson fails to show that her counsels' deficient performance prejudiced her defense.[7]

---

7. As explained in part II, Jackson's ineffective assistance of counsel claim for failing to raise a *Swain* claim is procedurally barred. Neither the

Supreme Court nor this circuit has resolved the issue of whether a procedurally barred ineffective assistance of counsel claim may nonetheless

Jackson contends that her lead trial counsel, Ralph Burroughs, was ineffective for not raising any objection to the prosecutor's use of peremptory strikes despite Burroughs's long-standing knowledge of the County's systematically prejudicial use of peremptories. She contends that this ineffectiveness constituted cause for her failure to raise a jury challenge at trial. The district court agreed, and "unhesitatingly conclude[d] ... that petitioner did not receive her constitutional right to adequate counsel." 752 F.Supp. at 1561. Burroughs testified at the district court evidentiary hearing that he was very aware of the Tuscaloosa County District Attorneys' practice of using peremptory challenges to eliminate blacks far out of proportion to their numbers in the population. He testified that prosecutors had admitted to this practice in their conversations with him:

Q. .... Had you had any conversations with any assistant district attorneys prior to [1984] or any district attorneys prior to that time about this practice?

A. Uh, I'm—I'm sure we did. There were times when I would sort of ridicule a district attorney ... for just going down and striking blacks....

. . . .

Q. Did they acknowledge that they did that?

A. Uh-huh....

. . . .

Q. Did they acknowledge that they did that?

A. Yes, sir.

. . . .

And the best thing all they knew was a rule of thumb and strike all the blacks. Some of the oldies assistant district attorneys I think would tell [the younger attorneys] that. I think I have heard them say that.

Q. All right. Now you saw this very thing happen in the trial that you tried for Patricia Jackson, is that right?

A. I, uh—I felt so, yes, sir.

Q. You in fact saw that Mr. Hudson struck every one of the blacks on her venire?

A. Yes, sir.

HR 387–89. Burroughs thus knew of the Tuscaloosa County D.A.'s Office's systematic practice of using peremptories to disproportionately exclude blacks from petit juries. Burroughs knew that the "rule of thumb" was to "strike all the blacks." And he saw this rule played out in his client's murder trial. Yet Burroughs did not raise any objection at trial to the prosecutor's use of peremptories.

■ Under *Strickland,* a counsel's performance is measured for "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2065. To be effective within the bounds set by *Strickland,* an attorney need not anticipate changes in the law. *See Poole v. United States,* 832 F.2d 561, 565 (11th Cir.1987) (counsel not ineffective for failing to raise *Batson*-type objection before *Batson* was decided, because *Batson* standard was substantial break with *Swain* ), *cert. denied,* 488 U.S. 817, 109 S.Ct. 54, 102 L.Ed.2d 33 (1988). Similarly, counsel need not pursue constitutional claims which he reasonably believes to be of questionable merit. *See Lancaster v. Newsome,* 880 F.2d 362, 374–75 (11th Cir.1989) (counsel not ineffective for failing to object to jury composition where he reasonably believed that method to be constitutional, and thus made "informed, tactical decision" not to object).

Whether, in this case, counsels' failure to raise a *Swain* objection at trial fell within professionally competent standards is a difficult question. We initially recognize that at the time of trial, when *Swain* remained the

be asserted as *Sykes* cause for failing to raise a second, underlying claim in the state proceedings. For the reasons expressed above, we hold that Jackson cannot prevail on her ineffective assistance of counsel claim. We therefore decline to decide whether or not Jackson, had she presented a viable ineffective assistance of counsel claim, would be permitted to assert the procedurally defaulted ineffective assistance of counsel

claim as *cause* for her failure to raise the *Swain* claim. *See United States v. Sjeklocha,* 843 F.2d 485, 488 (11th Cir.1988) (declining to decide issue unnecessary for resolution of case); *Meek v. Metropolitan Dade County,* 908 F.2d 1540, 1549 (11th Cir.1990) (refusing to "reach issue not necessary to the decision of this case"), *cert. denied,* 499 U.S. 907, 111 S.Ct. 1108, 113 L.Ed.2d 217 (1991).

standard, it was very difficult for defendants to succeed on a claim of unconstitutional use of peremptory strikes. *See generally Batson*, 476 U.S. at 92, 106 S.Ct. at 1720 (*Swain* "placed on defendants a crippling burden of proof"). In 1983, this court acknowledged that "[w]inning *Swain* claims are exceedingly rare," and that it appeared at the time that only two winning *Swain* claims had been brought anywhere. *Willis*, 720 F.2d at 1220.

On the other hand, in *Swain*, "the U.S. Supreme Court ... made clear that the intentional use of peremptory challenges to exclude blacks from trial juries was a violation of the Equal Protection Clause." *Hollis*, 941 F.2d at 1477. Likewise, our predecessor circuit recognized as early as 1971 that under *Swain*, "[s]ystematic improper striking of juries may, no less than other prosecutorial misconduct, taint the criminal process." *United States v. Pearson*, 448 F.2d 1207, 1217 (5th Cir.1971).[8] We rejected the *Swain* claim asserted in *Pearson* because it was based solely on testimony and notes spanning a period of one week. Yet we also noted that the burden under *Swain*, although "most difficult ... is not insurmountable." *Id.* at 1218. It might be overcome, for instance, by "checking the docket for a reasonable period of time for the names of defendants and their attorneys, investigation as to the race of the various defendants, the final composition of the petit jury and the manner in which each side exercised its peremptory challenges." *Id.* at 1217.

■ The obstacles to proving a *Swain* claim at the time of Jackson's trial are obvious. Depending upon the facts of a given case, we might well conclude that an attorney was reasonable in strategically deciding to forego such a claim. *See, e.g., Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir.1992) (counsel's "strategic decision" to forego a *Swain* claim, given the "onerous burdens required," was afforded deference); *Horne v. Trickey*, 895 F.2d 497, 499–500 (8th Cir.1990) (rejecting ineffective assistance claim where appellate counsel "considered the *Swain* issue and decided not to raise it since the record did not

contain sufficient evidence to support such a claim").

■ In this case, however, trial counsel Burroughs was peculiarly aware of the extent and illicit motivation of the prosecution's systematic strikes of black venirepersons; yet he remained absolutely silent as prosecutor Hudson struck all blacks from the venire. There is no indication in the record that Burroughs's failure *even to raise an objection* to the prosecutor's strikes was a product of any tactical forethought and we can only speculate as to the reasons for Burroughs's silence. Perhaps he did not believe that a *Swain* claim could be won. Or perhaps he did not wish to raise the controversial specter surrounding prosecutorial discrimination. In either circumstance, given his knowledge of the prosecution's abuses, his failure to object at trial and thus preserve the issue for further review was not professionally reasonable. *Cf. Hollis v. Davis*, 941 F.2d 1471, 1479 (11th Cir.1991) (failure to object to unconstitutional venire composition was unreasonable and fell below *Strickland* standard), *cert. denied*, —— U.S. ——, 112 S.Ct. 1478, 117 L.Ed.2d 621 (1992); *Goodwin v. Balkcom*, 684 F.2d 794, 805–07 (11th Cir.1982) (failure to object to racial composition of petit jury lists unreasonable when based on counsel's belief that he "didn't think it would be to any avail" and his fear of "hostile social pressure had he raised a challenge"), *cert. denied*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983).

Based on the narrow facts of this case, we agree with the district court's conclusion that Burrough's failure to object to the prosecutor's discriminatory use of peremptories was "inexplicabl[e]," and neither "a studied, tactical or strategic decision" nor "a reasonable exercise of professional judgment." 752 F.Supp. at 1562. *Cf. Government of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir.1989) (where trial attorney ignored defendant's instruction that she object to peremptory strikes, "unique circumstances ... [led court] to conclude that [the] trial attorney's failure to object to the prosecutor's use of

---

8. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

peremptory challenges was unreasonable under prevailing standards").

■ We next address whether Jackson has satisfied the prejudice prong of the *Strickland* test. In making this inquiry, we bear in mind that the prejudice prong of *Strickland* is not co-terminous with the more general prejudice requirement of *Wainwright v. Sykes,* under which a federal habeas petitioner must demonstrate that the errors "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (emphasis in original); *Hollis,* 941 F.2d at 1480. Neither is it akin to the "harmless error" standard of *Brecht v. Abrahamson,* — U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), under which certain types of "structural" errors are *per se* prejudicial. *See Vasquez v. Hillary,* 474 U.S. 254, 263, 106 S.Ct. 617, 623, 88 L.Ed.2d 598 (1986) ("[W]hen a petit jury has been selected upon improper criteria ... we have required reversal of the conviction because the effect of the violation cannot be ascertained.") (citations omitted).

Rather, the *Strickland* test asks whether there is "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," but "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.*

In *Hollis,* we recognized that this test generally applied in the context of determining whether counsel's failure to object to an unconstitutionally constituted, all-white jury was prejudicial, and held that "because there [was] no transcript, we [were] unable to make the kind of judgment of probabilities which a court often makes when called upon to decide whether a trial error is or is not harmless." 941 F.2d at 1483. We thus found it unfair "to hold Mr. Hollis responsible for the lack of a transcript, [or] to assume that the transcript would have demonstrated a state case" so strong that a constitutionally constituted jury would probably have convicted him. *Id.*

■ Here, unlike *Hollis,* we have the benefit of a complete record. Following *Strickland,* we must determine whether there is a "reasonable probability" of a different result sufficient to undermine our confidence in the outcome of this case.[9]

■ The evidence presented at trial by the prosecution was not overwhelming, but it was strong. Three witnesses, Charlotte Archibald, Pelma Smith, and Jimmy Little testified that they witnessed all or part of the events surrounding the killing, all of which took place in and around the victim's home. Archibald testified that she witnessed the initial confrontation between Jackson and Walker, in which Jackson was the aggressor. She further testified that at one point, Jackson left the confrontation, went behind the house, and shortly returned, this time with a knife.[10] She witnessed Jackson further taunt the victim, who was standing on her own porch, and then stab her. Pelma Smith gave a similar account, although he did not witness the very outset of the confrontation. Smith testified that Jackson was the aggressor; that Jackson left the scene briefly but returned; and that Jackson then removed a knife from her purse, concealed it, approached the victim and stabbed her.[11] Then, according to Smith, Jackson yelled, "I'm going to kill you" or "I should have killed her."[12] Jimmy Little also testified that Jackson was the aggressor in the argu-

---

9. The district court, without explanation, presumed that prejudice existed simply because "had the *Swain* issue been raised and preserved, petitioner would have prevailed on it." 752 F.Supp. at 1562. This reasoning is incorrect under the *Wainwright v. Sykes* prejudice analysis. Under *Sykes,* in order for Jackson to prevail on the *Swain* claim, she must first prevail on her *Strickland* claim as cause. She therefore must demonstrate a "reasonable probability"—albeit not an actual mathematical probability—that counsels' objection would have yielded a different outcome.

10. Tr. R–78.

11. *Id.* at 122–23.

12. *Id.* at 150, 156.

ment; that she reacted angrily when he tried to intervene; that he heard the victim scream that Jackson had stabbed her and that Jackson then ran from the scene, smiling.[13] All of this evidence directly contradicted Jackson's testimony that she stabbed Walker after Walker had instigated an argument and pulled a knife on her.[14]

The jury returned a verdict of guilty as to the murder charge. It thus rejected the lesser charge of manslaughter, which the trial judge had instructed was "killing ... prompted by a sudden heat of passion excited by sufficient legal provocation."

We would have more confidence in the verdict had it been delivered by a constitutionally composed jury, with both black and white members. But having conducted a thorough review of the record, we cannot conclude there is a "reasonable probability that, but for counsel[s'] ... errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. The jury's verdict in this case was substantially supported by the evidence, particularly by testimony that Jackson returned to the scene after retreating, retrieved a knife from her purse, and then concealed it before stabbing Walker. Moreover, the crime in this case did not have any particular racial dimensions, which would cast doubt upon a verdict returned by a racially unbalanced, unconstitutionally composed jury. *Cf. Huffman v. Wainwright*, 651 F.2d 347, 350 (5th Cir. Unit B, 1981) (in evaluating prejudice under *Sykes* exception, "this Court has looked to see if the case had racial or sexual overtones") (citations omitted).[15] Here, the victim was a black female, as is Jackson. Nothing in the record indicates that a racially balanced jury would have been more likely to acquit or convict of a lesser charge than was the all-

white jury in this case. As Burroughs himself noted, "the black community was just as concerned about how their people behaved in their neighborhood as the white people were," and "black jurors ma[k]e very good state ... jurors." [16]

Jackson has not fulfilled the *Strickland* requirements for an ineffective assistance of counsel claim. Thus, we need not address whether or not a defaulted ineffective assistance of counsel claim can nevertheless constitute cause, under *Sykes*, for failing to raise a second, underlying claim.[17] Accordingly, we reverse the district court's grant of habeas corpus relief as to Jackson's conviction.

## V.

Jackson also raises a ground for habeas corpus relief as to her sentence, wholly distinct from her *Swain* claim. She contends that her counsel was ineffective at the sentencing phase of the trial for failing to sufficiently investigate or present mitigating evidence to the jury or to the court. Specifically, she alleges that family members and friends, among others, would have offered effective mitigating testimony had they been sought out by her counsel.

Jackson was represented at both trial and sentencing by co-counsel Sogol and Burroughs. Sogol offered the primary argument at the jury portion of the sentencing phase, and rested his presentation to the jury on three points. First, he argued that a life sentence without parole would sufficiently deter the defendant. Second, he asked the jury to "consider" the volatile situation in which the killing took place. Third, he pointed out that crimes worse than Jackson's occurred "every day" but were punished with

---

**13.** *Id.* at 169–75.

**14.** Jackson testified at trial that while inside Walker's home, she and the victim argued over the sale of alcohol, and that the argument escalated when Archibald drew a pistol on her. According to Jackson, she told Archibald that she could "cut" Archibald before Archibald could fire on her. Jackson claimed that Walker then left to get her own knife, and when Walker reappeared, Jackson stabbed Walker with a kitchen knife taken from Walker's own night table.

**15.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

**16.** HR 422.

**17.** *See* footnote 7.

penalties less than death. Sogol's co-counsel, Ralph Burroughs, then offered a very brief and vague appeal to the jury, asking it to spare his client's life.[18] Neither lawyer offered any evidence regarding Jackson's personal history or background. Counsel were virtually silent during two subsequent sentencing hearings before the trial judge, held during the next week.

Sogol testified at the coram nobis hearing that he "did not in any way prepare or help prepare for any presentation of the evidence at the sentencing hearing."[19] He did not, for instance, "recall meeting with [co-counsel Burroughs] and sitting down and discussing what we were going to do past the guilt stage."[20] As a result, he was unaware of a vast pool of potential mitigating evidence, *see*

*infra*, such as Jackson's family history, her enormous personal hardships, her early pregnancy, her limited schooling, and her employment and personal relationships.[21] And Sogol acknowledged, unsurprisingly, that he "[didn't] think that [they] could have presented a worse situation than the one we did, which was nothing.... I don't think anybody could have presented a worse situation."[22]

Burroughs was questioned at both the coram nobis hearing and the federal habeas hearing as to his own pre-sentencing search for mitigating evidence. His memory was unclear as to what type of investigation he conducted into possible mitigation. Burroughs did not recall, for instance, how many

---

**18.** Burroughs entire presentation was as follows:

> Ladies and gentlemen of the jury, I guess I'm the oldest lawyer here. This has never happened to me before in my career. I'm sorry. I didn't mean to be emotional, but I can't help it. I ask you to consider all the circumstances because my biggest worry is whether or not I've done my job. And I'm not begging for mercy or anything. I just think that if you'll remember to look at Patricia Ann Jackson and think of the circumstances surrounding the crime. She didn't get to choose her lawyer, and I hope I haven't done anything to influence you. And all I can do is just to humbly ask you between the two verdicts that you have to not take her life.

Tr. R–224.

**19.** CNR 20.

**20.** CNR 62.

**21.** Sogol gave the following uncontroverted testimony at the coram nobis hearing:

> Q. Did you know ... at the time or develop at the time her employment history?
> A. No, sir.
> Q. That she had been working?
> A. No, sir. I did not.
> Q. That she worked at Peco Foods?
> A. No, sir.
> Q. That she worked as a private maid ... ?
> A. No, sir.
> Q. That she worked at the Ramada Inn?
> A. No, sir.
> Q. As to whether those employments had been successful or unsuccessful?
> A. *I had virtually no information about Patricia's social history.*
> ....
> Q. [That she had attended] Bailey Tabernacle Church?
> A. No, sir.

> Q. Whether or not there were friends and neighbors who might testify about her in some human capacity as a friend and neighbor?
> ....
> A. I never made those inquiries.
> ....
> Q. Did you know that the Public Defender's office had knowledge of [Jackson's] alcoholism and the attempted treatment for that?
> A. No, sir, I did not.
> ....
> Q. You know now that her father died when she was six years old?
> A. I know that now.
> Q. And her mother had problems with alcoholism?
> A. I know that now. I did not know that, either of those things, then.
> Q. That she became pregnant when she was fifteen years old?
> A. I know that now.
> Q. That she had just finished the eighth grade?
> A. I know that now. I did not know that then.
> ....
> Q. Did you ever talk to her about her mother dying of cancer?
> A. No, sir.
> Q. And her taking care of her mother for almost a year while she was dying of cancer?
> A. No, sir.
> ....
> Q. .... Did you or Mr. Burroughs or anybody, to your knowledge, make any attempt to contact members of [the victim's] family to discuss what their position might be after the capital murder verdict was rendered but before sentence was imposed?
> A. I did not.

R. 65–69.

**22.** CNR 64–65.

times he met with Jackson prior to trial.[23] He revealed at coram nobis that he was only minimally aware of certain potential mitigating evidence. Specifically, he testified as follows:

I remember that [Jackson] was, I think, born in 1947 and grew up in a—well, I guess, a whorehouse, shothouse combined and had that kind of atmosphere and had become pregnant as a teenager, sixteen or seventeen years old . . . and then the background, educational background, I think she had—I don't remember, but she didn't finish high school. Seventh, eighth or tenth grade, something like that. *General background history as we always did.*

CNR 88–89. Burroughs also testified at coram nobis that he did not even remember who took this background history, and did not recall undertaking any investigation beyond the preliminary "social history" which his office accumulated in every criminal case.[24] Burroughs did not interview anyone in Jackson's family, such as her daughter or her sister.[25]

Counsels' testimony indicated that their failure to present any of this evidence was in part due to a misunderstanding between them. Sogol testified at the state coram nobis hearing that "[i]t was my impression and remains my impression that the bulk of the responsibility for . . . the punishment hearing would rest with [Burroughs's] office as far as preparing and whatever was going to be presented."[26] Burroughs, by contrast, testified at coram nobis that "[t]here might have been a break in communication," and that he had expected Sogol to "take[ ] the lead in" investigating mitigating evidence.[27] Similarly, he testified at the habeas hearing

that he probably had relied on Sogol to prepare mitigating evidence.[28]

The deficiencies arising from counsels' minimal investigation were made worse by time constraints and other outside pressures. Counsel had only one hour to prepare for the sentencing hearing after the jury verdict. According to Burroughs, "[n]either one of us ever suspected that we would have to go to the sentencing hearing that quickly."[29] Moreover, Burroughs repeatedly testified that he was "shocked" by the verdict because he believed that the jury would find Jackson guilty of manslaughter, if anything.[30]

The coram nobis court made the following findings of fact. First, the court recognized that "[t]he only evidence introduced at the penalty stage . . . was the stipulation that [Jackson] was 33 years old." *Jackson,* 501 So.2d at 550 (quoting and incorporating trial court's findings). The court found that this absence of mitigating evidence occurred because the trial counsel, after an "extensive pre-trial investigation which included talking to Petitioner's neighbors and talking to the Petitioner about her criminal history and personal background . . . did not discover any witnesses helpful to her defense at . . . [the] penalty stage[ ] of her trial." *Id.* The court did not make any factual finding, however, as to the amount or scope of the effort aimed at developing mitigating evidence for sentencing phase purposes.

The federal habeas court's subsequent evidentiary hearing unearthed a great wealth of information about Jackson's life history that was not presented at sentencing. Jackson testified that she dropped out of school in the eighth grade because she became preg-

23. CNR 80–81.

24. CNR 90–91.

25. HR 408; CNR 126–27.

26. CNR 19; *see also* CNR 2.

27. CNR 95–96.

28. Burroughs offered the following testimony:

Q. And it was your understanding as you prepared for the trial, as you concentrated on

Mrs. Jackson's defense of self-defense, that Mr. Sogol was concentrating on what y'all would do and what y'all would present on her behalf in the event that a sentencing hearing was held before the jury, is that right?
A. . . . I would say that I would have probably relied on Joel to have done most of that. . . .
Because I respected his knowledge of the law and his keeping current on the law.
HR 415.

29. *Id.* at 415.

30. *Id.* at 400, 417; CNR at 92–94, 98.

nant;[31] that her mother was an alcoholic who abused her on an almost daily basis;[32] that she nonetheless nursed her mother through a terminal illness, shopping for her, washing her hair, and changing her catheter;[33] that she assertedly was devoted to her own child, Charlsie, who lived with her at the time;[34] or that the man whom she had stabbed fifteen years earlier had abused her, and was beating her at the time of the killing.[35] She further testified as to her employment history, which included washing cars, washing dishes, and cutting the liver from chickens at Peco Foods.[36] Jackson's sister, Julia Lee Thomas, testified as to their close relationship, and corroborated Jackson's own testimony about her mother's abuse and alcoholism.[37] Thomas further testified that her sister was generally even-tempered unless under the influence of alcohol, as she was the day of the killing.[38] And Thomas testified that the man whom Jackson had killed in 1966, Jackson's boyfriend, did indeed have a reputation for abusing women.[39]

Jackson testified that she would have offered testimony at sentencing had she been asked.[40] Similarly, her sister, Ms. Thomas, who indicated that she loved her sister "dearly," presumably would have testified if asked.[41]

Also testifying at the habeas hearing was Dr. Mary Ann Rosenzwerg, department head of the Mental Health Section of the Student Health Center of the University of Alabama. Dr. Rosenzwerg testified as an expert as to Jackson's psychological makeup, based on previous psychological evaluations of Jackson and her own interview with her. She indicated that intelligence tests placed Jackson at the borderline range of intelligence, above mental retardation.[42]

Based on the testimony adduced at this hearing and that presented on coram nobis, the district court held that Jackson's counsel was ineffective for having failed to prepare for the sentencing phase. The court found that "[b]etween the time of petitioner's indictment and sentencing, her lawyers did no work on the sentencing aspects of her case." 752 F.Supp. at 1556. Thus, "[n]o social history of petitioner was undertaken prior to either of the sentencing hearings [and] [n]o family members or friends were contacted."

31. HR 150.

32. Jackson offered the following testimony at the federal habeas hearing:

> Q. Do you have a judgment as to whether or not your mother was an alcoholic?
> A. I would assume she was. I would say she was.
> Q. Did [your mother] beat you with an extension cord?
> A. Yes.
> Q. How often would that happen?
> A. I got a whipping just about every day or every other day.
> Q. That take place through your whole childhood, as a teenager?
> A. Yes, because most of the time I wet the bed up until I was thirteen, so I got a whooping about that.
> Q. You wet the bed?
> A. Yeah, until I was about thirteen. So I had to get a whipping for that every day.
> I was slow in school, so I had to get a whipping for that.... And most days when I didn't, when she would be sick or when she would be drunk.

*Id.* at 160–163.

33. *Id.* at 153–54.

34. *Id.* at 151.

35. *Id.* at 155–56.

36. *Id.* at 166.

37. Thomas testified as follows:

> Q. .... What method would [your mother] use to whip you?
> A. She would whip us with an extension cord.
> ....
> THE COURT: Did she bruise or batter you?
> A. Okay. Yes. Sometimes she would whip us with the extension cord, you know, and the blood—she would beat the blood out of us.
> ....
> Q. Did you ever observe bruises or marks on Patricia after those?
> A. Several times.

HR 129–30.

38. *Id.* at 127.

39. *Id.* at 132.

40. HR 150.

41. HR 135–36.

42. *Id.* at 196–97. Rosenzwerg also testified that in her opinion, Jackson was an alcoholic at the time of the killing, and had been for approximately eight years.

*Id.* The district court therefore concluded that sentencing stage counsel was ineffective, and that Jackson therefore was entitled to be resentenced.

■ Before resolving the substantive ineffective assistance claim, we briefly address the state's argument, based on *Keeney v. Tamayo–Reyes,* —— U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), that it was error for Jackson and her sister to testify at the district court's evidentiary hearing, as they could have testified at the coram nobis hearing but did not. We find this argument unavailing, as the district court in this case was not required to presume the state coram nobis findings correct.

■ Whether Jackson's attorney made an informed tactical decision regarding what evidence to put forth at sentencing is a question of fact. *Cunningham v. Zant,* 928 F.2d 1006, 1016 (11th Cir.1991). The state judge found that counsel made a "strategic decision not to call witnesses" because it "could have opened the door to putting her pending assault with intent to murder case before the jury." *Jackson,* 501 So.2d at 550 (quoting and incorporating trial court's findings). However, the assault with intent to murder charge was pending against Jackson's sister, not against Jackson, a fact which counsel knew or should have known.[43] Although ordinarily a factual determination made by the state court is entitled to a presumption of correctness, the statutory presumption of correctness does not apply if "such factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d)(8); *Thames v. Dugger,* 848 F.2d 149, 151 (11th Cir.1988); *McBride v. Sharpe,* 25 F.3d 962, 972 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 489, 130 L.Ed.2d 401 (1994). We hold that because a crucial finding of the state coram nobis court was not fairly supported by the record, the district court appropriately held an evidentiary hearing.

■ "A claim of ineffective assistance of counsel is a mixed question of law and fact subject to plenary review under the two-prong test" of *Strickland. Cunningham v. Zant,* 928 F.2d at 1016. A petitioner must show that counsel's performance fell beneath the range of professionally competent assistance and that the deficient performance prejudiced the defense.

■ In determining whether a counsel's performance fell below professional norms, we "allow attorneys broad discretion to represent their clients by pursuing their own strategy." *Horton,* 941 F.2d at 1460–61. Thus, although a capital defendant generally "has the right to present virtually any evidence in mitigation at the penalty phase," *Lightbourne v. Dugger,* 829 F.2d 1012, 1025 (11th Cir.1987) (citations omitted), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988), this right exists only insofar as her counsel reasonably deems such mitigation evidence appropriate. *See Mitchell v. Kemp,* 762 F.2d 886, 889 (11th Cir.1985) (attorney "has no absolute duty to present mitigating character evidence"), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987). So long as a defendant's counsel makes a "reasonable strategic judgment to present less than all possible available" mitigation evidence, counsel's performance is presumed effective. *Mitchell,* 762 F.2d at 889 (quoting *Stanley v. Zant,* 697 F.2d 955, 965 (11th Cir.1983), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984)); *see also Middleton v. Dugger,* 849 F.2d 491, 493 (11th Cir.1988) (where failure to put mitigating evidence before the jury "was a *tactical choice* by trial counsel ... such a choice must be given a strong presumption of correctness") (citing *Funchess v. Wainwright,* 772 F.2d 683, 689–90 (11th Cir.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986)).

■ Similarly, a counsel's decision not to further investigate and develop mitigating evidence must be reasonable and fall within the range of professionally competent assistance:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable profes-

---

**43.** To ascertain this, Jackson's counsel would only have to ask their client. Thus, any reasonable investigation would have uncovered this fact. *See Bolender v. Singletary,* 16 F.3d 1547, 1557 (11th Cir.1994) ("defense counsel has the duty to conduct a reasonable investigation").

sional judgments support the limitations on investigation. In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066; *see also Rogers v. Zant,* 13 F.3d 384, 386 (11th Cir.1994).

■ The question of whether an attorney's actions were a product of a tactical decision is an issue of fact, and a state court's decision as to this issue is therefore presumed correct, absent convincing evidence to the contrary. *See Horton v. Zant,* 941 F.2d at 1462; *see also Cunningham,* 928 F.2d at 1011 ("[s]tate factual findings ... are entitled to a presumption of correctness" by a reviewing habeas court). Nonetheless, whether an attorney's tactical decision is a *reasonable* one, falling within the range of professional competence, is an issue of law reviewed de novo by this court. *Horton,* 941 F.2d at 1462; *Bundy v. Wainwright,* 808 F.2d 1410, 1419 (11th Cir.1987).

■ We agree with the district court's conclusion that counsel did not make a *reasonable* "strategic decision" to forego presenting mitigating evidence, and did not even undertake a *reasonable* investigation into such evidence. Thus, even if we defer to the state coram nobis court's finding that counsel made a "strategic decision" to forego mitigation evidence, that decision was not a reasonable one under this circuit's precedent.

■ In order for counsel to make a professionally reasonable decision whether or not to present certain mitigating evidence— in this case, *any* mitigating evidence—that counsel must be informed of the available options. Thus, "[o]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton,* 941 F.2d at 1462 (citing *King v. Strickland,* 748 F.2d 1462, 1464 (11th Cir.1984)); *see Blanco v. Singletary,* 943 F.2d 1477, 1502 (11th Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992); *Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.), *cert. de-*nied, 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989); *Armstrong v. Dugger,* 833 F.2d 1430 (11th Cir.1987); *Tafero v. Wainwright,* 796 F.2d 1314, 1320 (11th Cir. 1986), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 782 (1987). Although counsel need not "investigate every evidentiary lead," he must gather enough knowledge of the potential mitigation evidence to arrive at an "informed judgment" in making that decision. *Harris,* 874 F.2d at 763.

In cases where sentencing counsel did not conduct enough investigation to formulate an accurate life profile of a defendant, we have held the representation beneath professionally competent standards. *See, e.g., Blanco,* 943 F.2d at 1501–03 (counsel's performance deficient where his sole attempt to procure mitigation witnesses for penalty phase was to leave messages for the witnesses and await their responses, and he thus ultimately conducted no interviews); *Harris,* 874 F.2d at 763 (counsel deficient where he did not investigate defendant's family, scholastic, military and employment background); *Middleton,* 849 F.2d at 493 (performance deficient where "trial counsel conducted almost no background investigation, despite discussions with Middleton concerning the existence of such mitigating evidence" as psychiatric problems, brutal childhood, physical, sexual and drug abuse, and low I.Q.); *Armstrong,* 833 F.2d at 1433–34 (performance deficient where trial counsel's investigation of mitigating evidence was limited to single conversation with defendant and his parents, and another conversation with defendant's parole officer).

In this case, Burroughs had a small amount of information regarding possible mitigating evidence regarding Jackson's history, but he inexplicably failed to follow up with further interviews and investigation. Had he done so, he would have discovered substantial evidence of Jackson's personal hardships; her brutal and abusive childhood at the hands of an alcoholic mother; her devotion to her mother, sister, and daughter; her lack of schooling and low intelligence; and her work history. The "general background history" secured by Burroughs upon undertaking the case was a far cry from a reasonable investigation into mitigating evi-

dence. *See Middleton,* 849 F.2d at 493. Sogol, on the other hand, concededly sought absolutely no information as to mitigating evidence, as he believed that investigation to be Burroughs's responsibility.

The state nonetheless argues that Jackson's counsel made a reasonable "strategic decision" not to present mitigating evidence, based primarily on their fear that such a presentation would open the door to a pending assault with intent to murder charge—a charge which Burroughs later discovered involved not Jackson, but one of her sisters.[44] Burroughs testified that the failure to present mitigating evidence was at least partially influenced by the prosecution's threat to introduce this charge, which defense counsel were informed of within one hour before sentencing.[45] Burroughs also testified, however, that he recalled Jackson informing him that her sister, not she, was the subject of that charge.[46] Despite this warning from Jackson, and without "any proof of [the charge] at that time," [47] defense counsel nonetheless did not investigate whether the purported charge was valid.

Viewed in totality, Jackson's counsels' decision to acquiesce in the prosecutor's warnings was not reasonable; a legal decision to forego a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation. Jackson's attorneys could have—should have—asked for a continuance, to investigate their client's claim that the charge did not pertain to her. Instead they unreasonably acquiesced in the prosecutor's strategic warnings by presenting no mitigating evidence. This acquiescence by Burroughs and Sogol was not a reasonable "tactical decision" borne of reasonable preparation. *Cf. Lewis v. Lane,* 832 F.2d 1446 (7th Cir.1987) (counsel was deficient for stipulating to a prior conviction which did not exist), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988).

■ In sum, as to both Sogol and Burroughs, "[t]he ultimate decision that was reached not to call witnesses was not a result of investigation and evaluation." *Blanco,* 943 F.2d at 1503. Their failure to investigate and present mitigating evidence therefore fell below the standards of reasonably competent legal performance guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.[48]

Having determined that counsels' failure to present mitigating evidence fell below levels of professional competence, we must determine whether prejudice arose from this failure. The prejudice prong is satisfied where the petitioner has demonstrated that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." *Horton,* 941 F.2d at 1463 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068).

■ We conclude that Jackson sufficiently demonstrates prejudice stemming from her counsels' errors. We have found prejudice in past cases where counsel's failure to investigate resulted in similar omissions of mitigating evidence. *See, e.g., Blanco,* 943 F.2d at 1504 (prejudice arose where counsel failed to procure a psychiatrist at sentencing to testify that defendant had mental health

---

44. HR 402–03; CNR 117.

45. HR 400.

46. HR 412.

47. HR 413 (Burrough's testimony).

48. We do not hold that failure to present mitigating evidence constitutes *per se* ineffective assistance of counsel. As we have acknowledged, strategic reasons may in some cases exist to forego making any presentation of mitigation. *See, e.g., Bolender v. Singletary,* 16 F.3d 1547, 1558–59 (11th Cir.1994) (decision to forego mitigation presentation was reasonable strategy where, *inter alia,* defendant had taken the stand

during the guilt phase and described his personal and employment history and where several jurors appeared "teary-eyed" during reading of guilty verdict that immediately preceded sentencing phase); *Rogers,* 13 F.3d at 388 (failure to develop or introduce mitigating evidence of defendant's drug use before murder was reasonable and not ineffective assistance); *Davis v. Kemp,* 829 F.2d.1522, 1536–39 (11th Cir.1987) (counsel not ineffective for foregoing mitigation presentation where one available mitigation witness had given damaging testimony in a prior trial and other mitigation evidence would have allowed the state to introduce evidence of a knife fight which defendant was involved in days before the murder), *cert. denied,* 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988).

problems and a very low IQ, and suffered bouts of paranoia and depression); *Harris,* 874 F.2d at 763 (prejudice arose where counsel's failure to investigate led to omission of potentially mitigating evidence concerning defendant's family, scholastic, military and employment background); *Blake v. Kemp,* 758 F.2d 523 (11th Cir.) (prejudice occurred where counsel did not prepare or present mitigating evidence, although four friends of defendant and defendant's mother would have offered character testimony), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985).

At the sentencing phase, counsel could have elicited testimony from, at a minimum, Jackson and her sister. Counsel could have presented to the jury and the court emotional and substantial testimony of Jackson's good character and devotion to her family despite a life of hardship and abuse. Instead, counsel presented brief arguments [49] which encompassed four abbreviated points: that the goal of deterrence would be sufficiently served by a life sentence; that the evidence suggested that Jackson had acted in anger, in response to "threats and words"; that far worse crimes often are punished with sentences less than death; and that although Jackson had not chosen her own lawyer, Mr. Burroughs was worried "whether or not [he'd] done [his] job." [50]

Many death penalty cases involve murders that are carefully planned, or accompanied by torture, rape or kidnapping. Jackson's crime, by contrast, executed with a single plunge of a knife, apparently was borne of irrational and sudden temper. Evidence showing the genesis of Jackson's irrational rage through an abusive upbringing, in addition to evidence of Jackson's good character in her relationships with her family and her employment history, thus might well have benefitted the defense far more than the argument presented. *Accord Harris,* 874 F.2d at 763–64 ("[E]vidence seeking to show appellant's character as being good may have had a greater impact on a jury deciding whether to impose the death penalty for this crime—a burglary gone horribly awry—as opposed to one involving murder as the intended goal...."). [51]

■■■■ Because we conclude that a reasonable probability exists that a jury hearing this evidence would have recommended life, Jackson suffered prejudice from her counsels' errors. We thus affirm the district court's grant of habeas relief as to the sentence imposed.[52]

---

**49.** The sentencing arguments from both Sogol and Burroughs occupy under three pages of transcript space, totalling seven paragraphs. Tr.R. 221–24.

**50.** *Id.*

**51.** In *Francis v. Dugger,* 908 F.2d 696, 703 (11th Cir.1990) (per curiam), *cert. denied,* 500 U.S. 910, 111 S.Ct. 1696, 114 L.Ed.2d 90 (1991), we held that "[g]iven the particular circumstances of th[at] case including, among other things, the fact that Francis was thirty-one years old when he murdered Titus Waters, evidence of a deprived and abusive childhood [was] entitled to little, if any, mitigating weight," and that defense counsel's failure to introduce such evidence therefore was not prejudicial. The facts of *Francis,* however, differ substantially from those in this case. Most notably, the record in *Francis* demonstrated the existence of three valid aggravating factors: Francis committed a deliberately planned torture murder of a government informant. *Id.* at 704. We determined that these aggravating factors outweighed any potential mitigation evidence. Here, by contrast, Jack-

son's brutal childhood was only one of several mitigating factors, weighed against a single aggravating factor of Jackson's prior guilty plea.

Moreover, unlike the counsel in *Francis* who made a reasonable strategic decision "to deliver a highly impassioned emotional argument [at penalty phase] which, rather than focusing on Francis, emphasized the Easter season, forgiveness, compassion, and the value of life," 908 F.2d at 703, counsel in this case delivered a brief sentencing phase argument which essentially summarized the crime that Jackson had committed. This case therefore involves a higher probability of prejudice.

**52.** We find no merit in petitioner's argument on cross-appeal that it was prejudicial error for the sentencing court to consider uncounseled misdemeanors. We likewise reject without further discussion Jackson's argument that the use of her prior felony conviction as an element of the murder charge and as an aggravating factor violated her due process rights. We therefore affirm the district court's denial of relief as to both grounds for the reasons articulated in the court's ruling. *See* 752 F.Supp. at 1557–59.

## VI.

For the foregoing reasons, we REVERSE the ruling of the district court as to the independent claim of ineffective assistance of counsel at the guilt phase; we REVERSE the ruling of the district court as to Jackson's claim under *Swain;* and we AFFIRM the ruling of the district court as to ineffective assistance of counsel at the sentencing phase. The district court's ruling is AFFIRMED in all other respects. We REMAND to the district court for proceedings consistent with this opinion.