PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/29/99
THOMAS  K. KAHN
CLERK

_____

No. 97-6365

_____

D. C. Docket No.   CV 95-H-8005-E
CR 90-H-266-E

DAVID RONALD CHANDLER,

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(October 29, 1999)**

Before EDMONDSON, BIRCH and BARKETT, Circuit Judges.

BIRCH, Circuit Judge:

In 1991, Ronald David Chandler was convicted of, inter alia, procuring the killing of an individual in connection with a continuing criminal enterprise, 21 U.S.C. § 848(e)(1)(A), and sentenced to death.[1] In this appeal from the denial of his motion to vacate and for a new trial, filed pursuant to 28 U.S.C. § 2255, Chandler raises numerous claims related to both his convictions and sentences. We conclude that Chandler received ineffective assistance of counsel during the sentencing portion of his trial. We therefore vacate the death sentence imposed in this case and remand for resentencing in light of this opinion. We affirm Chandler's convictions and sentences with respect to all remaining claims.

## I. BACKGROUND

Chandler's convictions arise from his involvement in the cultivation and distribution of substantial quantities of marijuana, and his efforts to protect his

---

[1]During the same proceeding, Chandler was also convicted of engaging in a criminal enterprise, 21 U.S.C. § 848, conspiracy to distribute marijuana, 21 U.S.C. § 846, using or possessing a firearm during the commission of an offense, 18 U.S.C. § 924(c)(1), and laundering of monetary instruments, 18 U.S.C. § 1956(a)(1)(B)(I), and sentenced to two concurrent life terms and several terms of five and six years. On direct appeal, we vacated Chandler's conviction and sentence for conspiracy, but affirmed his convictions and sentences on all other counts. United States v. Chandler, 996 F.2d 1073 (11th Cir. 1993).

Because our disposition of Chandler's claims on appeal concerns solely the constitutional propriety of his death sentence, which was imposed pursuant to his conviction for causing an intentional killing, we consider exclusively the evidence and sentencing issues relevant to his conviction under 21 U.S.C. § 848(e)(1)(A). We find that Chandler's remaining claims regarding all aspects of the pre-verdict phase of his trial do not warrant habeas corpus relief.

2

profits derived from this operation.[2]  The jury found that Chandler offered to pay Charles Ray Jarrell, Sr., an individual who assisted Chandler in various aspects of his marijuana enterprise, to kill Marlin (Marty) Shuler, who Chandler learned had provided information to a local law enforcement agency that could implicate Chandler with regard to his illegal activities.  The jury further found that Jarrell, who had his own reasons for disliking Shuler, shot and killed Shuler after the two men had consumed a large quantity of beer and engaged in target practice.

At the conclusion of Chandler's trial, the jury returned a guilty verdict at 1:50 in the afternoon.   The penalty hearing began the following morning at 9:00.  At that hearing, Chandler's lawyer, Drew Redden, introduced into evidence stipulations agreed to by the government showing that (1) Chandler had no prior convictions, (2) Charles Ray Jarrell, Sr. would not be prosecuted for Shuler's murder, and (3) a taped conversation that the jury heard, in which Chandler stated that "he'd have to kill somebody" if he were "set up," took place several months after Shuler's murder.  See Exh. 15 at 12-30-32.  Counsel also elicited testimony from Chandler's mother, Irene Chandler, and wife, Deborah Chandler.  As statutory aggravating factors justifying the imposition of the death sentence, the

---

[2]The facts underlying Chandler's convictions are described in detail in our earlier opinion related to Chandler's direct appeal.  See Chandler, 996 F.2d at 1080-82.

government alleged that (1) Chandler had engaged in conduct that he intended would result–and did result–in Shuler's death, (2) Chandler procured Shuler's murder by promising to pay something of pecuniary value, and (3) Chandler committed Shuler's murder after substantial planning and premeditation. Although the jury did not find that Chandler had committed Shuler's murder after substantial planning and premeditation, it concluded that the government had proven two of three aggravating circumstances, and recommended that Chandler be sentenced to death. Vol. 4-221.

Following our affirmance of Chandler's convictions and sentences on direct appeal, Chandler filed this motion to vacate and for a new trial, pursuant to 28 U.S.C. § 2255. The district court held an evidentiary hearing at which Redden testified. In addition, twenty-seven witnesses[3] presented testimony of what they would have testified to at the penalty phase of Chandler's trial if they had been asked to do so. The district court found that "the mitigation evidence that Chandler's trial counsel could have offered was of tenuous value[,]" R7-457 at 69, and, without deciding whether trial counsel's performance was deficient or unreasonable, concluded that Chandler had not been prejudiced by counsel's

[3]In fact, forty witnesses were available to testify at this evidentiary hearing. The district court, however, prohibited Chandler from calling more than twenty-seven witnesses to testify as to the mitigating evidence that could have been presented at trial.

4

failure to elicit testimony at trial from those present at the evidentiary hearing. See id. at 70. In reaching this determination, the court specifically found that many of the witnesses who testified regarding Chandler's good character did not know of his illegal activities, or knew him before the events giving rise to this case transpired. In addition, the court noted that all of the character witnesses who testified "showed a strong bias in favor of Chandler." Id. at 68. In sum, the court concluded that the testimony of these twenty-seven witnesses "would have carried little or no mitigating weight," id., and that "[w]eighing this weak character evidence against the strong aggravating evidence that the jury accepted . . . there is no reasonable probability that the jury would have recommended a non-death sentence if trial counsel had presented more character evidence." Id. at 70.

On appeal, Chandler submits that his trial counsel provided ineffective assistance of counsel in the penalty stage of his trial by failing adequately or timely to investigate and discover the substantial number of witnesses within the small community in which Chandler lived who would have testified to his good qualities. Chandler contends that, but for counsel's failure to present to the jury the readily available, strong case in mitigation of the offense for which Chandler was convicted, there is a reasonable probability that Chandler would not have received the death penalty.

## II. DISCUSSION

We review Chandler's ineffective assistance of counsel claim de novo.

Tarver v. Hopper, 169 F.3d 710, 714 (11th Cir. 1999). To obtain a reversal of his

death sentence on the ground of ineffective assistance of counsel, Chandler

> must show both (1) that the identified acts or omissions
> of counsel were deficient, or outside the wide range of
> professionally competent assistance, and (2) that the
> deficient performance prejudiced the defense such that,
> without the errors, there is a reasonable probability that
> the balance of aggravating and mitigating circumstances
> would have been different.

Baxter v. Thomas, 45 F.3d 1501, 1512-13 (11th Cir. 1995) (quoting Strickland v.

Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984)).

This test applies with equal force to both the guilt and sentencing phase of a capital

proceeding. See Strickland, 466 U.S. at 686-87, 104 S. Ct. at 2064.

### A. Performance

As noted earlier, Chandler avers that his trial counsel failed to prepare

adequately for the penalty phase of his trial and, as a result, did not discover or

present considerable mitigating evidence that was available at the time of the

penalty hearing. We previously have observed that "[a]n attorney has a duty to

conduct a reasonable investigation, including an investigation of the defendant's

background, for possible mitigating evidence," Porter v. Singletary, 14 F.3d 554,

6

557 (11th Cir. 1994), and that "[t]he failure to do so may render counsel's assistance ineffective." Baxter, 45 F.3d at 1513 (quotation and citation omitted). We have also recognized that, although an attorney may, under some circumstances, make a strategic choice not to conduct a particular investigation, see Dobbs v. Turpin, 142 F.3d 1383, 1387 (11th Cir. 1998), "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 1387-88 (quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2066).

We must first determine, then, whether a reasonable investigation should have uncovered mitigating evidence. See Blanco v. Singletary, 943 F.2d 1477, 1500 (11th Cir. 1991) (citation omitted). If it should have, we must determine

> whether the failure to put this evidence before the jury
> was a tactical choice by trial counsel. If so, such a choice
> must be given a strong presumption of correctness, and
> the inquiry is generally at an end. . . . [If not,] it must be
> determined that defendant suffered actual prejudice due
> to the ineffectiveness of his trial counsel before relief will
> be granted.

Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir. 1988) (internal markings omitted). In applying these guiding principles to specific examples of attorney conduct, we previously have rejected the notion that "a strategic decision can be reasonable when the attorney has failed to investigate his options and make a

7

reasonable choice between them." Dobbs, 142 F.3d at 1388 (internal citation and quotation omitted). See also Baxter, 45 F.3d at 1514 (same); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) (trial counsel, who had a "small amount of information regarding possible mitigating circumstances regarding [petitioner's] history, but . . . inexplicably failed to follow up with further interviews and investigation" rendered constitutionally deficient performance.).

At the evidentiary hearing on Chandler's § 2255 motion, Redden testified that he had made "[v]ery little" effort to put together a mitigation case in connection with sentencing. Exh. 13 at 359.[4] Counsel further acknowledged that he had "not much" time to prepare Deborah and Irene Chandler for their testimony at the penalty stage of the trial and had never been to Piedmont, Alabama, the town in which Chandler resided, to speak with any people who might be able to serve as character witnesses. See id. at 372, 398.

The record reflects that the guilt-innocence proceeding ended at 2:30PM on April 2, 1991, and that the penalty phase was set to begin at 9:00 the next morning. Redden testified that on the afternoon on which Chandler was convicted, he asked Deborah Chandler to find some character witnesses to testify the next morning.

---

[4]In response to an inquiry as to whether he had done anything to prepare for the sentencing phase of the trial prior to the trial beginning, counsel stated "I would say basically not anything explicitly." See Exh. 13 at 331.

See id. at 363. He could not recall, however, whether he had ever discussed with Deborah Chandler, prior to this moment, the need for her to locate witnesses willing to testify on Chandler's behalf if he were to be convicted.[5] See id. It is undisputed that Deborah Chandler had to drive approximately two hours to return to Piedmont on the afternoon that Chandler was convicted, and two hours again the following morning to attend the penalty hearing. As a result, Deborah Chandler was given approximately twelve hours to round up mitigation witnesses who would then be called to testify with little or no preparation from trial counsel.

Similarly, Redden could not specifically recall what he may have advised Deborah Chandler, or anybody else, with regard to the nature of the testimony he hoped to elicit from her at the penalty stage. See id. at 364. When asked whether he thought he would have some opportunity to interview potential character witnesses Redden responded: "Well, only a hope. And not one that I really spent a lot of time or effort on or felt that there was that much time to spend on." Id. at 398. When asked why he had not "done any specific preparation for the death penalty phase," id. at 395, Redden offered the following explanation:

> Well, I guess, number one, you do what's coming up
> first, and you do what's immediately on you. Number

---

[5]Deborah Chandler testified that Redden first asked her to find character witnesses for the sentencing hearing on the afternoon that Chandler was convicted. See Exh. 12 at 19.

9

two, of course, if something happens in your interviewing of a witness or talking to a particular witness that could be of value ultimately in that, you'd make at least a mental note of that. But there wasn't, as I've testified, anything specifically directed to that at that time and nothing was volunteered to me that I considered of value in there.

Id.

Irene Chandler, Chandler's mother, and Deborah Chandler, Chandler's wife, were the only witnesses who testified at the sentencing hearing. After asking Irene Chandler to supply information regarding her age, address, employment, marital status, and the whereabouts of her seven children, Redden briefly elicited testimony related to the construction and location of Irene Chandler's home. Although her responses to these questions intimated that Chandler had participated somewhat in the construction of his parents' house, the nature of counsel's inquiries permitted Irene Chandler to reveal little more than the fact that Chandler possessed masonry and carpentry skills and that he lived on a different side of Piedmont, Alabama from his parents.[6]

_____

[6]With the exception of the few initial, informational questions and answers previously mentioned, the following represents Irene Chandler's testimony in its entirety:

> Q: The place where you live at this time, how long have you lived on that property?
>
> A: We've lived on the property ever since we've been married, but we've lived in a house that we are living – is that what you are talking about – we've lived there for fourteen years.

Q: All right. And what does this property that you live on consist of?

A: Eighty acres.

Q: Eighty acres?

A: Yes, sir.

Q: Was this acreage that was acquired or bought or purchased during your marriage or was it family property, so to speak?

A: His and his daddy's, it was family property.

Q: Your husband and his father's?

A: And his father's, yes, sir.

Q: All right. And there was eighty acres of it?

A: Yes, sir.

Q: When was the home that you live in now built?

A: In the late seventies, in the seventies, I think.

Q: Okay. Was any timber used in that home off your property?

A: Yes, sir.

Q: Who built the home?

A: The family did, John [Chandler's father] and the boys.

Q: John and the boys built it?

A: Yes, sir.

Q: What sons worked on it?

A: All of them – excuse me – Ronnie, Ronnie built most of it and he laid the bricks there on the house. It's a brick house and he laid the

11

bricks and –

Q: All right. How was the lumber prepared for the building of the house?

A: Some of it was bought – excuse me – some of it was bought and some that they sawed at the sawmill.

Q: What sawmill are you talking about?

A: The Chandler sawmill, our sawmill, John and the boys.

Q: There on your property?

A: Yes, sir.

Q: All right. And over how long a time was it that they all worked on the house?

A: I don't know. It was a long time.

Q: Okay. Is Ronnie married?

A: Yes, sir.

Q: What was his wife's maiden name?

A: Debora[h] Johnson. She's a Johnson.

Q: All right. And is that Ronnie's only marriage?

A: Yes, sir.

Q: And about how long has he been married?

A: Oh, you know, I don't – I don't know – eighteen or nineteen years, I guess. I don't really know.

Q: All right. Do they have any children?

A: Have three.

Q: Boys, girls or what?

A: Two boys and one girl.

Q: Now, you live about how far you say from Piedmont and in what direction from Piedmont?

A: East, I guess. I don't really know. It's – it's on the Jacksonville Highway, it's –

Q: Okay. Is it toward Jacksonville from Piedmont?

A: From Piedmont, yes, sir.

Q: Okay. And you're about three miles?

A: About three miles out, uh-huh.

Q: Is that the same side of Piedmont that Ronnie lives on, for example?

A: No. Ronnie lives in the other direction.

Q: Okay.

A: Out.

Q: You go through Piedmont?

A: Yeah.

Q: About how far beyond Piedmont does he live?

A: I don't know, don't really know how many miles it is out there.

Q: All right. Y'all are not close neighbors, then, as far as your houses are concerned?

A: No, no, huh-uh.

Q: All right.

13

The testimony that counsel elicited from Deborah Chandler did not differ markedly from that presented by Irene Chandler, though it was even more abbreviated.  Redden asked Deborah Chandler to supply basic information regarding her address, marital status, and the number and names of the children she and Chandler raised during their marriage.  The remainder of Deborah Chandler's testimony, like that of Irene Chandler, represents a short exposition on the manner in which the Chandler brothers built houses.  Again, the few questions counsel asked Deborah Chandler afforded her virtually no  opportunity to comment on her husband's personal qualities or attributes.[7]

---

Redden:  I think that's all.
Exh. 15 at 12-37-40.

[7]Again, other than a few brief introductory questions that allowed Deborah Chandler to identify herself as Chandler's wife, the entirety of Deborah Chandler's testimony follows:

Q: Where did you and Ronnie live when you first got married?

A: Mostly we lived on Haslam Street.

Q: What street?

A: Area of Piedmont.

Q: What street?

A: Haslam street.

Q: All right. How do you spell that?

A: H-a-s-l-a-m.

Q: Do you own the home that you live in now?

A: Yes, sir.

Q: How was it built?

A: We started building the house about – well, beginning the preparations for it about two years after we got married. Ronnie got a loan at the bank and borrowed the money and we began to pick up rocks and tear down old chimneys and things like that for the ground work because Ronnie builds.

Q: All right. Now, so did you buy the property with the bank loan?

A: Yes, sir.

Q: Okay. And then you started accumulating materials?

A: Yes, sir.

Q: Over about what period of time was it that the house was in planning and under construction?

A: Well, see, it took a long time. They built the building down at Ronnie's daddy's house and as Ronnie would work and as he would have the material, we would take a little bit at a time and we would put it down there in the building and as they worked at the sawmill and done lumber and one thing and another, you'd have to store it cause it takes a long time, you just don't get it overnight.

Q: Who all worked on the house, as far as the family is concerned?

A: All of Ronnie's brothers.

Q: Okay. And we've had testimony about his mother and his father's house being built that way and his house being built that way. Any of the other children of the marriage have houses that were built by the brothers?

15

A: Yes, sir.

Q: Who?

A: Well, Eddie's house was built that way and Phillip and Deb's house was built that way. And Steve and Linda, they didn't build a new house but what they done is as the children grew and they needed more room, they put an extension onto their house.

Q: All right. And they worked on that?

A: Yes, sir.

Q: There has been testimony in this case that Ronnie had remarked to Lieutenant Cole that two years before a conversation that they had, that your eleven-year old daughter was raped?

A: Yes, sir.

Q: Was that a fact?

A: Yes, sir.

Q: Following that time, has there been any period of treatment or therapy required for her?

A: Yes, sir, extensive.

Q: And now, she's thirteen years of age; is that correct?

A: Yes, sir.

Q: You mentioned also some burglaries of your home. Was your home broke into some occasions and burglarized?

A: Yes, sir.

Q: Is Ronnie in custody at this time?

A: Yes, sir.

Q: Since how long? Has he been in custody continuously?

16

Having reviewed this testimony, along with the testimony of Redden and the twenty-seven character witnesses who testified at the evidentiary hearing, we conclude that trial counsel rendered deficient performance with respect to the penalty phase of Chandler's trial. First, a wealth of mitigating testimony was available and could have been presented at Chandler's sentencing hearing. As is discussed further below, the testimony by friends, neighbors, and relatives presented at the hearing was not only consistent and impressive in its enumeration of Chandler's positive qualities but, moreover, was marked by many specific stories and instances of individual acts of kindness and generosity that painted a picture of Chandler wholly at odds with the image drawn by the evidence at the guilt phase of the trial. Furthermore, virtually every witness who testified at the

---

A: He's been in custody since I believe it was the 25th of September when he was arrested.

Q: 1990?

A: Yes, sir.

Q: And has been in custody continuously since that time?

A: Yes, sir.

Redden: Okay. That's all.

Id. at 42-44.

17

evidentiary hearing specifically stated that he or she would have been willing and available to testify at the penalty hearing if asked to do so.  See Exh. 12 at 88, 93, 105, 114-15, 126-27, 138.

Indeed, counsel's testimony at the evidentiary hearing bears out the fact that nobody was interviewed or contacted with respect to the penalty phase of the trial. As noted earlier, Redden conceded that he had not "done any specific preparation for the death penalty phase,"[8]  Exh. 13 at 395, that "nothing was volunteered to [him] that [he] considered of value," id. at 396, and that his approach to Chandler's trial was to "do what's coming up first . . . what's immediately on you," id. at 395. As Redden conceded, he never went to Piedmont, Alabama, to find out whether there might be any available mitigation witnesses, and never discussed the need for such witnesses with Deborah Chandler until after the guilty verdict, the afternoon before the penalty phase was set to begin.  Redden further acknowledged that he

---

[8]We acknowledge that an attorney's later admission that he did not prepare adequately for a sentencing hearing may not be dispositive of the petitioner's ineffective assistance of counsel  at sentencing claim in every case. See Tarver, 169 F.3d at 716 (where district court noted that lawyer's decision to focus on an acquittal at the expense of sentencing was "a deliberate decision," we remained "unpersuaded by the admission (during state collateral proceedings) of [the defendant's] lawyer that he had not prepared adequately for sentencing."). Where there is no evidence that strategic considerations informed the lawyer's conduct with regard to the penalty phase, or where the lawyer's choices at this stage are a function not of strategy but of lack of preparation, counsel's subsequent testimony at an evidentiary hearing regarding this lack of preparation cannot be discounted.

18

never asked for, or considered asking for, a continuance from the trial judge[9] prior to the sentencing hearing, see Exh. 13 at 367, and that, even up until the day of the sentencing hearing, he was not certain who he intended to call as witnesses. See id. at 363. Redden's essentially passive stance with respect to the penalty phase – waiting for someone to volunteer helpful information and preparing only what came next as the trial progressed – virtually guaranteed that no witnesses would be available to testify on Chandler's behalf on the day of the hearing. See Blanco, 943 F.2d at 1501-02 ("To save the difficult and time-consuming task of assembling mitigation witnesses until after the jury's verdict in the guilt phase almost insures that witnesses will not be available."). Under the circumstances presented in this case, counsel's failure both to seek out and adequately prepare witnesses to testify as to mitigating circumstances did not fall within the boundaries of professionally reasonable judgment. See Jackson, 42 F.3d at 1368 ("[Counsels'] failure to investigate and present mitigating evidence . . . fell below the standards of reasonably competent legal performance guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.")

_____

[9]See Jackson, 42 F.3d at 1368 (noting that counsel "could have -- should have -- asked for a continuance" to investigate whether criminal charge which government threatened to introduce at sentencing pertained to defendant, rather than forego presentation of mitigating evidence).

19

It is also critical to note that, although Redden testified that he had tried to bring out from Deborah and Irene Chandler's testimony a sense of Chandler's "humanity," id. at 372, this stated intention "stands in stark contrast to the presentation that actually took place." Collier v. Turpin, 177 F.3d 1184, 1200 (11th Cir. 1999). Counsel's examination of these witnesses was minimal at best. His entire line of inquiry covered, almost exclusively, the manner in which the Chandler family built its houses, the materials used for construction, and the location of each residence. Even when counsel digressed briefly from this peculiar exploration of Chandler's masonry and carpentry skills, his questions stopped far short of providing any meaningful information about Chandler that reasonably would have aided the jury in its sentencing determination.[10] In short, the kinds of questions Redden asked and the brevity of the examination left the jury with the impression that the two women who theoretically knew Chandler perhaps better or more intimately than anyone else -- his wife and his mother – had little or nothing to say about the man other than the fact that he liked to participate in building houses.

---

[10]Indeed, although Redden asked Deborah Chandler to confirm the fact that her daughter had been raped two years earlier, he did not pursue this subject in any way that reflected on the role that Chandler, as the girl's father, may have played in comforting or caring for his daughter in a time of emotional crisis. See Exh. 15 at 12-44. In effect, once Deborah Chandler confirmed the accuracy of the information regarding her daughter's rape, Redden dropped the subject entirely.

In failing to present any of the mitigating evidence that was available at the time of Chandler's sentencing hearing, evidence that revealed a markedly different and more admirable side of Chandler than that which the jury received at the guilt phase of the trial, counsel's performance brought into question the reliability of the jury's determination that death was the appropriate sentence. See Collier, 177 F.3d at 1201-02 ("Counsel presented no more than a hollow shell of the testimony necessary for a 'particularized consideration of relevant aspects of the character and record of [a] convicted defendant before the imposition upon him of a sentence of death.") (quoting Woodson v. North Carolina, 428 U.S. 280, 303, 96 S. Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)).

Furthermore, there is no evidence that any strategic considerations motivated Redden's lack of investigation or preparation relative to the presentation of mitigating evidence for the penalty phase of Chandler's trial[11], nor is there any evidence that he made a reasoned decision not to ask other witnesses to testify or to

---

[11]As we have noted, if the decision was a tactical one, it will usually be upheld, since counsel's tactical choice to introduce less than all available mitigating evidence is presumed effective. See Jackson, 42 F.3d at 1366. "Nonetheless, the mere incantation of 'strategy' does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been reasonable under the circumstances." Stevens v. Zant, 968 F.2d 1076, 1083 (11th Cir. 1992); see also Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.").

stay clear of any more substantive questions regarding Chandler's character when examining Deborah and Irene Chandler.

Although it is undisputed that Redden interviewed over sixty witnesses in conjunction with the guilt phase of the trial, when counsel has not made any strategic decision to limit either the investigation or presentation of mitigation testimony, counsel must seek out witnesses "specifically for sentencing"[12] prior to trial or, at the very least, prior to the day the jury returns its verdict. Notwithstanding counsel's passing reference to making a "mental note" of witnesses interviewed in connection with his preparation for the guilt phase of trial who might be "of value" with respect to mitigation, see Exh. 13 at 396, there is no evidence that Redden asked a single question or conducted any interview specifically with mitigation in mind.[13] See Jackson, 42 F.3d at 1368 ("[A] legal decision to forgo a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation.").

---

[12]Blanco, 943 F.2d at 1501.

[13]Although we recognize that, under some circumstances, there may be some overlap between the investigatory efforts of counsel relative to both the guilt and penalty stages of a capital trial, the bifurcated nature of such trials indicates that the two phases are to be treated as distinct and separate proceedings and may involve the investigation and presentation of different types of evidence. Indeed, it is entirely possible that the types of witnesses a lawyer might seek out for purposes of presenting mitigating testimony could be precisely those that were the least connected to the conduct for which the defendant is on trial. In any event, there is no evidence here that Redden targeted any of his investigation in preparation for the guilt phase with a view toward establishing a case in mitigation of the offense should the jury choose to convict Chandler.

22

Moreover, there is no evidence that counsel made a calculated decision not to present a more substantial mitigation case in order to avoid "opening the door" to detrimental evidence by the government. Redden testified that he knew that some individuals in the Piedmont community "considered Ronald Chandler to be a drug dealer," Exh. 13 at 399, and that "the law enforcement community in Piedmont . . . was hostile to him." Id. In light of the fact that Chandler had just been convicted of orchestrating a murder-for-hire in connection with his leadership role in a marijuana-growing enterprise, however, the fact that some in the community deemed Chandler a drug dealer and that the police were antagonistic toward him could hardly come as a surprise to the jury during the penalty phase.

In fact, the record does not reveal any new, damaging information that the government would have – or could have – brought out during the penalty phase and, thus, does not provide a basis for an informed decision by Redden to limit the scope of the penalty-hearing testimony. It appears that the government had already managed to present that kind of evidence to the jury in the form of allegations that Chandler was responsible for the suspicious "disappearances" of Jeff McFry and Patrick Burrows, conduct for which Chandler was not even charged. See Chandler, 996 F.2d at 1090-91. Thus, there is no indication in the record that Redden made a strategic decision to limit his presentation of character evidence for

23

fear of opening the door to the introduction of damaging evidence. Compare Johnston v. Singletary, 162 F.3d 630, 642 (11th Cir. 1998) (per curiam) (Counsel not ineffective for not introducing defendant's medical records at penalty phase where these records "contained a substantial amount of damaging data relating to [defendant's] criminal history that his lawyers expressly sought to avoid introducing.").

Counsel's duty to make an independent investigation reasonably targeted at locating mitigating character witnesses was not lessened by the fact that the case for Chandler's acquittal was relatively strong. The fact that there is a reasonable chance of acquittal on capital charges does not in any way alleviate the attorney's obligation to prepare for the worst. Consequently, we have rejected the assertion that an attorney's "good faith expectation of a favorable verdict" somehow excused his failure to prepare for the penalty phase of a capital case. See Blake v. Kemp, 758 F.2d 523, 535 (11th Cir. 1985). Again, we recognize fully that a lawyer, who necessarily works with limitations of time and resources, may choose to focus more energy and effort on some stages of the trial if the case calls for such a division of effort. Here, however, there is no evidence or testimony that such a deliberate decision was made. Instead, the record indicates that counsel began his

24

preparations for the penalty phase only when it was absolutely imminent.[14]  In sum,
we conclude that Redden's performance during the sentencing phase of Chandler's
trial fell below the standard of reasonableness required by the Sixth Amendment.[15]

[14]In applying the well-established principles governing ineffective assistance of counsel claims to the specific facts of this case that are in the record, we cannot agree with the dissent's description of defense counsel as pursuing some sort of "strategy" relative to the sentencing proceeding.  The dissent suggests in footnote 4 that the majority is second-guessing trial counsel "from the vantage of hindsight,"particularly with regard to our determinations that (1) a jury would not be surprised to learn that some members of the Piedmont community – particularly those in law enforcement – viewed Chandler as a drug dealer and (2) there was no new, damaging evidence that Chandler's lawyer sought to avoid bringing before the jury during the sentencing hearing that might have justified his failure to present further mitigating character testimony.   The dissent may disagree with our application of the law to the particular facts of this case, but our judgment here in no way contravenes prior precedent from this circuit.

We readily acknowledge, for instance, that where the record and the law reasonably support such a  strategy, trial counsel may be reasonable, in a constitutional sense, in deciding to limit its mitigation case for fear of "opening the door" to prejudicial testimony at sentencing.  It is worth emphasizing, however, that, to pass constitutional muster, a strategy necessarily must be reasonable in light of the particular facts of the case at hand.  Here, even assuming that trial counsel deliberately chose not to present the wealth of (uninvestigated) available mitigating character evidence precisely because he feared "opening the door" to testimony that some people in Piedmont thought that Chandler was dealing drugs, such a "strategy" was not reasonable in light of the fact that this jury had just convicted Chandler of arranging a contract-murder in connection with his drug business.

Moreover, based on the facts revealed in this record, we need not engage in any speculation, nor need we avail ourselves of the benefit of hindsight, to conclude that there was no new damaging testimony that Chandler's lawyer wanted to keep the jury from learning by limiting the scope of testimony at sentencing.  Indeed, it would require speculation on our part to find that trial counsel engaged in a strategy designed to prevent the jury from discovering potentially prejudicial information not revealed during the guilt phase of the trial.  Stated simply, the record contains absolutely no suggestion that such evidence existed, nor does the government point us to any such evidence, nor does the dissent explain what that evidence might have been.  Although we agree that, as a general proposition, a lawyer acts within constitutionally reasonable professional bounds in seeking to limit testimony at sentencing where he fears that such testimony might open the door to other damaging information that the jury has not yet heard, the record must in some way support the assertion that such evidence exists.  We fail to find such support in this record.

[15]For the sake of clarity, it is worth advancing several brief observations regarding Judge Edmondson's forceful and thoughtful dissent.  First, the witnesses interviewed at the guilt phase of trial were not necessarily or actually the same witnesses that would have evidence appropriate or effective for establishing mitigation during the sentencing phase of trial. Accordingly, focusing time

## B.  Prejudice

---

and attention on even a large quantity of witnesses in preparation for the guilt phase of a capital trial may have little to do with discharge of a lawyer's duty to investigate and marshal witnesses relative to the quality of their potential mitigation testimony.  Just as the nature of witnesses differ in the liability and damages phases of a civil trial, the same may be said of witnesses in a capital criminal trial.  Stated differently, the type and nature of witness sought out relative to the guilt phase may only be, by happenstance, also helpful in the sentencing phase of trial.

Second, the dissent concludes based upon a few ambiguous statements made by the defense counsel, that counsel pursued a "strategy" of "lingering doubt" and had a "central theme from start to finish."  Defense counsel testified that: " . . . if that jury was going to give him the death penalty based on what they had heard, their minds were made up as to that . . . " [R13-365; dissent, fn.3].  To elevate such a fatalistic mind-set to a "strategy of lingering doubt" and thereby excuse on such basis the inept sentencing phase presentation in this case as constitutionally adequate renders, I suggest, almost meaningless the very concept of effectiveness advanced in Strickland v. Washington.  If the bar is placed that low to measure the effective assistance of counsel, our criminal justice system is not likely to command respect.  Accordingly, I do not understand that we depart from any binding principles established in Tarver v. Hopper, 169 F.3d 710, 714-16 (11th Cir. 1999), as suggested by the dissent.

Moreover, even a brief comparison of the conduct of defense counsel in Tarver with that of Chandler's counsel during the sentencing phase of this trial discloses stark and significant differences in what was actually undertaken.  The record in this case reflects none of the actions taken by Tarver's counsel, characterized in that case as pursuit of a "strategy of lingering doubt," as being accomplished here.  In Tarver, both the district court and the state court reviewing Tarver's motion for post-conviction relief made explicit determinations that defense counsel had made a "deliberate strategic decision" to focus on acquittal at the expense of sentencing, 169 F.3d at 712, 716.  No court has made any such finding in this case.  Perhaps more importantly, Tarver's trial counsel testified specifically that he had made a decision regarding the best allocation of his time; that, prior to sentencing, he had "interviewed every witness Tarver thought would be helpful as mitigation witnesses," id. at 714, and had "presented every witness he thought would be helpful." Id.  Again, the facts of this case are markedly different.  There is no indication in this record that Chandler's trial counsel made a deliberate choice regarding the allocation of his time and resources, nor is there any testimony that, prior to sentencing, he made any effort to interview those witnesses that might have been helpful with regard to mitigation.  As a result, while the record in Tarver revealed that there was a substantial overlap between the nature of counsel's preparation prior to and subsequent to the defendant's conviction, no such evidence exists in the record here.  As stated earlier, we do not quibble with the dissent's broad propositions of law, only with the application of that law to the facts of this case.  Because the record in Tarver is distinct in very significant ways from the record presented in this case, we cannot agree that our decision here – which ultimately involves an application of uncontroversial principles of law to the specific record with which we are confronted – is contrary to any legal proposition established in Tarver.

26

We next consider whether counsel's deficient performance prejudiced Chandler such that, without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different. We conclude that Chandler was prejudiced by his lawyer's deficient performance.

First, the quality of the testimony proffered at Chandler's post-conviction hearing was impressive. Although forty witnesses were available to testify at the hearing, the district court took the testimony of only twenty-seven of these witnesses. These witnesses, working and contributing members of the Piedmont community, not only offered general opinion testimony as to Chandler's good character traits, but they backed up their opinions with specific examples of compassionate acts by Chandler. Numerous witnesses testified about frequent instances of Chandler's generosity. See, e.g., Exh. 12 at 55 ("[M]y son [Tony] didn't have any shoes and Ronnie was out at a neighbor's behind us and he saw Tony and he made a statement to Tony . . . about [his] shoes and, Tony said I don't have any. It wasn't long after that the neighbors that was there that Ronnie was visiting that day brought Tony two pair of shoes, instead of one it was two."); id. at 68 ("I remember several occasions and he would bring vegetables by the house and leave them and I remember a time or two . . . [when] Ronnie wouldn't hesitate to leave three or four, five dollars, whatever he had, there for to see the kids got their

27

lunch."); id. at 73 ("If there was somebody on . . . [Chandler's construction] crew right there that was a working man and he came up there and tell him he didn't have dinner, money would buy his dinner with, Ronnie would see that that man ate if he worked."); id. at 124 ("I've known of him buying groceries for folks who he thought needed it . . . [Once he] [s]topped on the way home from Georgia one night and he knew of some folks that needed some groceries and stopped in and bought a couple of bags of groceries."); id. at 179 ("He's the type of person that he if knew you needed something he would give it to you. I've known him to give work to people that were in need of work, to give people money when they needed it.")

Many testified as to Chandler's altruistic, benevolent nature. One man who had known Chandler "all his life" offered the following anecdote:

> I know Ronnie was a mason, a carpenter, and he know people that had lost their jobs before, when he found out about it, he would make sure they got some work. And I know one occasion personally that he took money out of his own pocket and gave it to a guy that had just lost his job had three or four kids and I personally know that Ronnie didn't have the money to give away but he did any way.

Id. at 99, 100-01. Another testified that, when one of Chandler's neighbors lost a son in a car accident, "Ronnie took money and gave to them because they didn't have insurance to bury the boy and took money to them to help them bury him." Id. at 113. Two other witnesses confirmed this anecdote, and noted that, at the

28

time this incident occurred, Chandler could ill afford to pay for the boy's burial. See id. at 225, 250. Another witness testified that when her husband died, Chandler offered to let her "stay in [his] house as long as I wanted to. It was mine to do with and just as long as I always had a place to stay, not to worry about it." Id. at 112.

Several witnesses testified that Chandler had a particular affinity with children. See, e.g., id. at 68 ("[Children] loved Ronnie. I mean, he'd play with them and, I mean, I'm not talking about five minutes. I mean he would spend 30, 45 minutes there just on the spur of the moment kind of playing. And you could tell he really enjoyed it."); id. at 92 ("Ronnie was a very caring person, a very giving person . . . . [M]y dad worked all his life, didn't have time to spend with us, so Ronnie kind of took us in and taught me the sport of hunting and fishing."); id. at 102 ("He was fantastic [with children]. He took his children and several other children that couldn't get out, take them riding, would introduce them to sports, shooting a bow, things of that nature.").

As the foregoing lengthy (though not exhaustive) description of the testimony presented at the post-conviction hearing indicates, this is not a case in which only marginal mitigating evidence existed. Rather, the quality and quantity of this evidence, almost all of which was available at the time of trial had Redden

inquired in a timely fashion as to who in Piedmont might be willing to testify on Chandler's behalf at the sentencing hearing, creates a reasonable probability that, but for counsel's failure to present even a small portion of this evidence, Chandler would not have received the death sentence.[16]

---

[16]We further note that we find unconvincing the district court's reasoning for wholly rejecting the value of mitigation testimony presented at Chandler's evidentiary hearing. Finding that the testimony of the twenty-seven witnesses would have been of "tenuous value," R7-457 at 69, the court observed that most of the witnesses knew Chandler prior to his involvement in the marijuana business and that they all "showed a strong bias in favor of Chandler." Id. at 68.

We previously have observed that, depending on the particular circumstances presented, character evidence that relates to events remote in time from the conduct for which the defendant has been convicted may carry less weight when balanced against aggravating factors, see Stanley v. Zant, 697 F.2d 955, 969 (11th Cir. 1983) ("When we know nothing of counsel's strategy, when the evidence not presented consists of general statements by family members that the defendant was, at a point in time remote from the events in question, a 'good boy' and when such evidence is cumulative of evidence presented during the guilt phase of the trial, then the 'ineffectiveness' prong of Washington v Strickland has not been satisfied."). We do not find the anecdotes and personal information relayed by many of the witnesses at the evidentiary hearing, however, to be so temporally remote from the events that gave rise to this action that their value can be summarily discounted. Many of the witnesses testified to their personal interactions with Chandler within five years of the time that the government claims Chandler became a marijuana grower and dealer. See Exh. 12 at 74, 107, 127, 212. Further, other witnesses testified that they continued to have contact with Chandler up until the time of his arrest. See id. at 95, 105. We disagree with the district court's characterization of this testimony as too remote in time from the conduct for which Chandler was convicted such that the value of the testimony would have been tenuous had it been presented at the sentencing hearing.

Moreover, we also question whether the "bias" revealed by the witnesses' testimony provides an adequate or sound basis on which to conclude that this testimony would not have made a significant difference in terms of the jury's sentencing decision. More importantly, mitigating character evidence by its very nature and definition -- and certainly mitigating character evidence that could ever persuade a jury not to impose the death sentence -- is evidence that evinces a "bias" in favor of the defendant. One wonders how a defendant could ever present valuable or persuasive mitigating evidence that is not biased.

30

Our conclusion is further strengthened when we consider the balance of aggravating and mitigating factors that would have been before the jury but for counsel's errors. As noted earlier, the three aggravating factors presented to the jury were that Chandler (1) intentionally engaged in conduct intending that Shuler be killed and resulting in Shuler's death, (2) procured Shuler's killing by promising to pay something of pecuniary value, and (3) committed the murder after substantial planning and premeditation. The jury, however, rejected the "substantial planning and premeditation" factor and, thus, weighed in the balance two aggravating factors. Set against this were two statutory mitigating factors introduced by stipulation: that Chandler had no prior criminal record and that the actual killer, Jarrell, would not be punished by death. See 28 U.S.C. § 848(m)(6) and (8). Given this essential equipoise of statutory factors, it is reasonably probable that the non-statutory mitigating factor of character evidence – particularly given the extensive, detailed, and eloquent testimony that was available at the time of the hearing – would have led the jury to a different result.

Moreover, we note that, notwithstanding the district court's characterization to the contrary, the murder of which Chandler was convicted was not "particularly egregious," R7-457 at 64, when viewed against the backdrop of our circuit

31

precedent.[17] We previously have observed that "[m]any death penalty cases involve murders that are carefully planned, or accompanied by torture, rape or kidnaping . . . . In these types of cases, this court has found that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." Dobbs, 142 F.3d at 1390 (citations omitted). Here, however, Shuler was shot in a murder that the jury found was not the result of substantial planning or premeditation. While horrible, the nature of this offense does not rise to the level of particularly cruel or heinous violent conduct that we previously have found to outweigh the prejudice caused by the omission of mitigating testimony during the penalty phase. See id. (where defendant, who had been previously convicted of three non-violent crimes, shot and killed two people during a robbery and struck another individual on the head with a gun, court found that "[t]he aggravating circumstances surrounding Dobbs's case, while deplorable, do not rise to such a level as to overshadow the significant mitigating evidence that

---

[17]It is worth noting that the government did not argue at trial that the jury should find as a statutory aggravating factor that Shuler's murder was committed "in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." 21 U.S.C. § 848(n)(12). Although we readily concede the difficulty of evaluating whether a particular murder is less "heinous" than any other murder, it is significant that the jury did not find -- and was not asked to find-- that Chandler killed Shuler in a particularly heinous or egregious manner. As a result, when considering whether the introduction of mitigating character evidence at sentencing would have made a difference in the jury's decision to impose the death sentence, we must be mindful of the fact that the jury did not weigh the manner in which Shuler was killed as a statutory aggravating factor in the balance of aggravating and mitigating evidence.

Dobbs's jury had no occasion to consider."); <u>Baxter</u>, 45 F.3d at 1515 (ineffective assistance of counsel for failure to present psychiatric history at sentencing, where only one aggravating circumstance was present, record was "virtually devoid of mitigating evidence" and "th[e] murder was committed by strangulation – it did not involve the sexual abuse or kidnaping common to other death penalty cases.").

## III. CONCLUSION

Chandler asks that we vacate his convictions and sentences and order a new trial. We affirm each of the convictions. We conclude, however, that Chandler received ineffective assistance of counsel during the penalty phase of his capital trial.[18] Accordingly, we vacate Chandler's death sentence and remand this case for resentencing in light of this opinion.

AFFIRMED in part, VACATED in part, and REMANDED for resentencing.

---

[18]Because we vacate Chandler's death sentence on ineffective assistance of counsel grounds, we need not address the remaining claims raised on appeal in connection with the imposition of a death sentence.

EDMONDSON, Circuit Judge, dissenting in part:

Today's court decides that Defendant's trial counsel performed so weakly at the sentencing phase that Defendant did not have counsel as required by the Constitution.  I do not think so.

Trial counsel based his presentation at the sentencing phase largely on residual doubt over Defendant's guilt.  This case is essentially the same as Tarver v. Hopper, 169 F.3d 710, 715 (11th Cir. 1999), in which we concluded that counsel was not ineffective.  I believe that today's decision cannot be squared with Tarver.  Because Tarver is the preexisting law of the circuit, today's decision seems not just mistaken, but also raises worries about full adherence to binding precedent.

Defendant argues that his counsel inadequately prepared for sentencing, spending fewer than 24 hours -- the time between conviction and the start of the sentencing phase -- and that counsel failed to investigate and to present sufficient character mitigation evidence.  This argument is basically the same as the one made by the defendant in Tarver, who claimed that his trial counsel had only spent four hours preparing for sentencing between conviction and sentencing and had failed to investigate and present sufficient character mitigation evidence.  We rejected defendant's claims in Tarver, concluding that counsel reasonably chose to focus his time, energy and efforts on acquittal and, if necessary, on residual doubt

34

at sentencing. Tarver's lawyer's acts were not found to be ineffective; but here the court comes down the other way, saying Chandler's lawyer was ineffective.

In Tarver, this court concluded that the four-hour characterization was "'inaccurate and misleading,' because of the overlap in preparation for the sentencing and guilt/innocence stages of the trial." Tarver, 169 F.3d at 715. Likewise, the claim of fewer than 24 hours in this case is inaccurate and misleading. In both cases, the lawyer had met with potential witnesses before and during the guilt phase but focused the limited time and resources on acquittal at trial and, then, on residual doubt at sentencing.

In this case, trial counsel interviewed 67 witnesses during his investigation leading up to trial,[1] many of whom were familiar with Defendant's reputation and were located in Defendant's home town: the rural Piedmont/Easom Springs area. Trial counsel stated that he conducted these interviews making "mental note[s]" of anything that might be of value later. We have pointed out in the past, that "[a] lawyer's time and effort in preparing to defend his client in the guilt phase of a capital case continues to count at the sentencing phase." Tarver, 169 F.3d at 715.

---

[1]Trial counsel had met with the Defendant frequently and had the benefit of Defendant's insight about what might be available. The lawyer interviewed Defendant's brother, wife, mother, former minister, and members of the community: some of the same kinds of persons interviewed in Tarver. For all that we know, trial counsel here interviewed every witness that his client ever suggested; at the evidentiary hearing on habeas corpus, neither side asked the trial lawyer whether his client had suggested witnesses to be interviewed for mitigation or otherwise.

Here, trial counsel did offer the testimony of Defendant's wife and mother at sentencing to show Defendant's humanity and the stability of family.[2] In <u>Tarver</u>, the lawyer had presented defendant's uncle. To show evidence of defendant's prior good works, defense counsel in this case already had some evidence from the guilt phase: that Defendant had given a soon-to-be married man the deed to a lot on which the man could build a house for his new family. And it was stipulated that Defendant had no criminal history.

Defendant's counsel did not call other character witnesses in mitigation because he (1) doubted whether character evidence would successfully mitigate the crime and (2) was afraid of opening the door to harmful cross-examination and rebuttal witnesses. Defense counsel believed that character evidence inherently would not help much and testified: "it would be at least questionable whether a sufficient impact of character type testimony could overcome a fixed opinion based on other evidence . . . [whether it] could change it from life to death. Or death to

_____

[2]The lawyer testified that he wanted to show, for example, with testimony about building their own houses from natural materials gotten from their own land, that these "were people who did not intrude themselves on others and who were peaceful people." The lawyer argued in closing at sentencing that Defendant's was a family with "tremendous stability," that Defendant was a man who was skilled with his hands, and all of this demonstrated "lives with some purpose." Putting up the wife and mother also called to the jury's attention, of course, that these innocent people would be punished too by the execution of their husband and son.

life." [R13-400-01, 365].[3]  I cannot say this view of how best to proceed is

unreasonable.

_____

[3]The evidence in this record indicates that trial counsel decided to stress lingering doubt about guilt, because he did not think character evidence -- even the testimony of good acts offered by Defendant at the evidentiary hearing -- would prevent the jury from giving Defendant the death penalty if they were absolutely sure he had procured this murder:

> Q:And that specific instances of the defendant helping people is probably the most compelling of that type of evidence, a mere opinion that he's a good person is one thing, but to say he did this for me is even better.  You recognized that, did you not?
> A: Well, I recognize its admissibility as a compelling nature, I wouldn't test it.
> Q: You didn't think that type of testimony would be very helpful, is that your testimony?
> A: Well I'm -- if that's your question, I say in the whole picture of things as it existed at that time, if that jury was going to give him the death penalty based on what they had heard, their minds were made up as to that, I doubted that compelling would be an appropriate word.

[R13-365].  The conclusion that Defendant's attorney chose to pursue lingering doubt rather than character evidence is also shown by the following passage:

> Q: Prior to being able to make a determination of how compelling a witness would be in mitigation you would have to know what the witness was going to say, is that correct?
> ...
> A: I think that I could assume what a piece of testimony would be, for example.
> Q: Right.
> A: And assume the most favorable testimony that you might get and then form some judgment, not the most reliable judgment in the world, but some judgment about how compelling it might be.

[R13-368].

37

Trial counsel also testified that based on his interviews he found that "some individuals in the community considered [defendant] to be a drug dealer" and "that there were people in the community [who] were afraid of him." [R13-433, 399]. Given these facts, it was reasonable for trial counsel not to investigate further personally, especially given the knowledge that he already had other credible mitigation arguments. See Lambrix v. Singletary, 72 F.3d 1500, 1506 (11th Cir. 1996) ("[C]ounsel cannot be held responsible for failing to find mitigating evidence if, after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence."); see also Strickland v. Washington, 104 S. Ct. 2052, 2066 (1984) ("In other words, counsel has a duty to make reasonable

_____

From the testimony, it appears that Defendant's attorney thought that even the best character mitigating evidence would not be that compelling given the facts of this case: hence the decision to pursue the strategy of lingering doubt. (And, therefore, no need to request a continuance to look for more character witnesses). This path is not ineffective given the facts of the case against the Defendant, particularly considering that we are to view counsel's performance, not in hindsight (we now know what was done, at trial, was not successful), but "from counsel's perspective at the time." See Strickland v. Washington, 104 S. Ct. 2052, 2065 (1984).

By the way, the decision to pursue lingering doubt was made by an experienced and respected member of the Alabama bar -- a lawyer with over 40 years of experience in civil and criminal litigation who had tried over 1000 cases. "Our strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel." Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998).

38

investigations or to make a reasonable decision that makes particular investigations unnecessary"); <u>Williams v. Head</u>, 185 F.3d 1223, 1237 (11th Cir. 1999) ("to be effective a lawyer is not required to pursue every path until it bears fruit or until all hope withers . . . [a] decision to limit investigation is accorded a strong presumption of reasonableness").[4]  Highly important, our court already has "rejected the position that strategic decisions can be considered reasonable only if they are preceded by a thorough investigation . . .  we explained that the correct

_____

[4]Based on the information he had about what some of the community thought of the Defendant and the fact that the law enforcement community in Piedmont was hostile to Defendant, trial counsel testified that not only did he fear opening the door to unfavorable character evidence, but he also feared that the government would offer damaging rebuttal witnesses. [R13-399, 416]. Among other things, he testified that deciding whether to put on character witnesses when there was a possibility of the government cross-examining on various bad acts was a balancing act and that he did consider who and what might have been produced. [R13-416].

Mainly stating that after the guilt phase the jury would not be surprised to hear that some people thought Defendant was a drug dealer and that nothing in the record reveals what new damaging evidence would have come to light, today's court opinion scorns the decision not to focus on character evidence more. I submit, however, it was not unreasonable for trial counsel to be wary of provoking the prosecution to present a string of new witnesses testifying to Defendant's bad reputation and bad acts: evidence which would reflect and solidify any negative opinion the jury already had of the Defendant generally. Trial counsel knew he had other mitigating elements that he could (and did) advance.

More important, today's line of observation -- from the vantage of hindsight -- by judges on how best to proceed with the defense to the death penalty is, by its nature, troubling: the Supreme Court has said that it is not for this court to second-guess counsel's decision, but just to decide whether his performance was constitutionally deficient. <u>See</u> <u>Collier v. Turpin</u>, 177 F.3d 1184, 1200 (11th Cir. 1999) ("Although we might think that it would have been more prudent for [defendant's] attorneys to investigate other possible avenues for obtaining information about [defendant's] character and background, . . . 'in considering claims for ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled."'" (quoting <u>Burger v. Kemp</u>, 107 S. Ct. 3114, 3126 (1987) and <u>United States v. Cronic</u>, 104 S. Ct. 2039, 2050 n.38 (1984))). And we must recall, we have already said that there is no "duty on defense counsel to present general character evidence in every capital case." <u>Stanley v. Zant</u>, 697 F.2d 955, 961 (11th Cir. 1983).

approach toward investigation reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." Williams, 185 F.3d at 1237 (internal citations and quotations omitted); see also Rogers v. Zant, 13 F.3d 384, 386-88 (11th Cir. 1994) (decision not to investigate need only be reasonable to be competent).

Trial counsel in Tarver chose to focus his effort and resources on the guilt phase of the trial "based on his assessment of the likelihood of acquittal." Tarver, 169 F.3d at 712. The evidence supports the finding that counsel in this case also decided to focus on the guilt phase of the trial. Counsel's acts at trial are evidence of his intent. As for counsel's words at the post-conviction proceedings, not only did he testify that time constraints were such that this course is on what he chose to focus, but he thought he had a good case for innocence and consulted a jury selection expert to that effect.[5] [R-13-396, 360-61, 328]. This decision about how to invest the lawyer's time and energy is entitled to deference by this court. The evidence of guilt in this case was, by no means, overwhelming: Defendant did not, in fact, kill the victim; the issue was whether the person (Jarrell) who did the killing did so for Defendant or because the actual killer was settling his own score.

---

[5]He testified that "you do what's coming up first, and you do what's immediately on you" [R13-395]; that he did not have "that much time to spend" [R13-398]; and that he thought -- quite rightly, I believe -- Defendant had a realistic chance of not being convicted [R13-330, 360-61].

As in Tarver, I conclude that "the decision to focus on the acquittal of a capital murder was not unreasonable" and does not amount to inadequate preparation for sentencing. Tarver, 169 F.3d at 716.

Despite trial counsel's decision not to rely much on character evidence,[6] trial counsel did present a robust case for mitigation. In addition to the humanizing testimony of family, he highlighted this mitigation evidence: (1) Defendant had no prior criminal record; (2) the triggerman, Charles Ray Jarrell, would not receive the

_____

[6]"The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (en banc).

In addition, as the district court noted, the witnesses Defendant offered at the evidentiary hearing for post-conviction relief had little or no knowledge of Defendant's criminal acts. Their ignorance of this part of Defendant's life would significantly minimize the "humanizing effect" of these character witnesses and bring into doubt their reliability. See McQueen v. Scroggy, 99 F.3d 1302, 1314 (6th Cir. 1996). On cross-examination at the evidentiary hearing, these witnesses testified that knowledge of Defendant's threats to kill and turning a gun on a law enforcement officer would not affect their assessments of Defendant's character. The district judge -- who personally not only heard the witnesses' testimony, but observed their demeanor -- found that this "bias" "largely nullified" the value of their testimony: the jury would be unlikely to credit "witness[es] [who] believed that drug dealing and violent crimes were irrelevant to a person's character."

The decision not to call a witness is ineffective ultimately only if it can be said that every reasonable lawyer informed about this witness would have called him. See Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994) ("no relief can be granted on ineffectiveness grounds unless it can be shown that no reasonable lawyer, in the circumstances, would have done so"); White v. Singletary, 972 F.2d 1218, 1220 (11th Cir. 1992) ("We ask only whether some reasonable lawyer at trial could have acted, in the circumstances, as defense counsel acted"). I think many reasonable trial lawyers would decide not to use these witnesses.

If not every reasonable lawyer would have called a certain witness or witnesses (even among lawyers who were completely informed about the witness or witnesses), I fail to understand why we would order a new trial on the ground that the witness or witnesses were not called in the first trial: at the new trial, the witnesses again might not be called. If the new trial can be just like the first trial, how can the first trial be constitutionally inadequate while the new trial is constitutionally adequate?

41

death penalty; and (3) lingering doubt existed of Defendant's guilt.  We have vindicated lawyers who did less.  See, e.g., Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc)  ("the Supreme Court and this Court in a number of cases have held counsel's performance to be constitutionally sufficient when no mitigating circumstance evidence at all was introduced, even though such evidence . . . was available"); Francis v. Dugger, 908 F.2d 696, 702-04 (11th Cir. 1990) (not ineffective to decide to argue value of life and compassion rather than present mitigation testimony about defendant's poor childhood and mental dysfunction).

When I look at  (among other things) the trial transcript, I see that trial counsel in this case -- as in Tarver -- had a central theme from start to finish.  He sought to raise and to rely on doubt, both at trial and at sentencing, about Defendant's guilt in fact.  As we stressed in Tarver, lingering doubt on guilt is "an effective strategy for avoiding the death penalty."  Tarver, 169 F.3d at 715 (noting that scholars -- their articles were cited -- have presented evidence that raising doubt about guilt is the **most** effective method of avoiding death penalty).[7]

---

[7]That such residual doubt can easily exist is not just a figment of a lawyer's imagination. The jury in this case was instructed at the guilt phase this way: "[I]t is not necessary that the defendant's guilt be proven beyond all possible doubt.  It is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt."  As this instruction shows, the law recognizes that jurors who have found a person guilty of a crime may well still have doubt about his true guilt. Thus, the law itself points to and lays the foundation for a good argument based on this lingering doubt when the jury is later asked to impose death, the ultimate and most irremediable punishment.  In my view, nothing about the trial lawyer's advancement of this

The evidence was uncontroverted that someone (Jarrell) other than Defendant had shot the victim outside of Defendant's presence. At issue was whether the killer had acted on Defendant's behalf. Trial counsel contended at sentencing that the killer was not motivated by Defendant to kill the victim, stressing that the killer had attempted to kill the victim before; that the killer had had 23 beers that day before shooting the victim; that a history of personal animosity existed between the victim and his actual killer; that the killer's statements after being arrested were inconsistent; and that a recorded damaging statement that Defendant had to "kill somebody" was made almost three months after the killing took place and did not indicate that Defendant was speaking about the victim in this case. [R15-27, 59-60].

Counsel argued that it would be a mistake and "cruel and unusual punishment" to give Defendant the death penalty considering these circumstances. I am convinced the argument had force and was a valid line to take. Of course, this argument was ultimately unsuccessful; but so are roughly half of all arguments made in American courtrooms. Lack of ultimate success has almost nothing to do with whether the lawyer met his professional obligations as an advocate.

---

argument signals submissiveness or fatalism; stressing residual doubt is a straightforward and sound defense. And if we know with hindsight that this argument did not prevail, we do not know that an argument based chiefly on character witnesses would have proved to have been one bit more successful.

The evidence shows that trial counsel's conduct at sentencing, in this case, was "within the broad range of reasonable performance we have recognized in other cases." Tarver, 169 F.3d at 715 (citing cases from this Circuit); see Bolender v. Singletary, 16 F.3d 1547, 1558 (11th Cir. 1994) ( counsel not ineffective for deciding to forgo arguing defendant's troubled history and instead arguing at sentencing that defendant should not be treated more harshly than codefendants); Porter v. Singletary, 14 F.3d 554, 556-59 (11th Cir. 1994) (not ineffective for failing to present mitigating evidence of difficult background and family relationships); Singleton v. Thigpen, 847 F.2d 668, 670 (11th Cir. 1988) (performance not constitutionally deficient even though mitigation efforts consisted of asking mother and wife to identify possible witnesses); see also Elledge v. Dugger, 823 F.2d 1439, 1445 (concluding counsel to be ineffective because of total failure to interview defendant's relatives where defendant had confessed to crime and when counsel knew mitigation was only defense), partially withdrawn on other grounds, 833 F.2d 250 (11th Cir. 1987).

Today's court gives too much weight to trial counsel's testimony that he did "basically not anything explicit" to prepare for the sentencing phase. Not what is said by a lawyer in post-conviction proceedings, but what the lawyer did at the trial is the more important. If a trial lawyer preformed adequately at the trial, his

unartful explanation years later about that performance does not convert adequate performance at trial into inadequate performance at trial. Furthermore, particularly given the defense counsel's central theme -- doubt about guilt, in fact -- no clean, clear line separated preparing for the guilt phase and preparing for the sentencing phase. In such cases, even if a lawyer did nothing just for the sentencing phase in particular, it does not follow that he earlier did not do a lot that was useful at sentencing as well as at the guilt phase.

In Tarver, counsel said that he had not adequately prepared for sentencing. In Tarver, however, we recognized that merely because trial counsel did not label his act of concentrating on getting an acquittal as a strategic decision did not negate the evidence that his acts were deliberate. See also Wright v. Hopper, 169 F.3d 695, 707 (11th Cir. 1999) (deciding that even though defense counsel denied making strategic decisions about whom to investigate, evidence indicated that he "admitted to the process of making strategic decisions" because he admitted that he had other avenues to pursue concerning the remainder of the defense and also had to make choices in defending a client based on time, information, and what his client told him). Counsel's acts at trial as well as counsel's words at the habeas hearing are evidence. Furthermore, this court has repeatedly rejected relying upon counsel's own admissions of deficient performance: "Because ineffectiveness is a

45

question which we must decide, admissions of deficient performance by attorneys are not decisive." Wright, 169 F.3d at 707 (quoting Harris v. Dugger, 874 F.2d 756, 761 n.4 (11th Cir. 1989)).

Something different could always have been done in these cases. But the trial of a murder case, like all litigation, requires the lawyer to decide -- to make hard choices -- what is the best use of his inherently limited time and energy. A lawyer can make a reasonable decision that, no matter what an investigation might produce, he wants to steer clear of a certain course: for example, not to rely on character evidence as the main pillar of mitigation. See generally Rogers, 13 F.3d at 386-87. Because trials involve imponderables, much room always exists after the fact for debate about the wisdom of the lawyer's choices. But we know that counsel need not investigate or present all available mitigating evidence. Waters, 46 F.3d at 1511; Rogers, 13 F.3d at 387 ("'strategy' can include a decision not to investigate"). More is not always better; for example, there can be a diluting impact when too many witnesses or arguments are used, the weaker points obscuring and confusing the main point.

Courts are required to presume strongly that defense counsel preformed reasonably and adequately. And I conclude the choices evidenced by the record here -- particularly the choice to work for an acquittal and then to focus on

lingering doubt about guilt at sentencing and not to clutter the case with mediocre character witnesses -- were well within the wide range of what is reasonable. The constitutional requirements were met. Defendant has the burden of persuasion to warrant post-conviction federal relief; and he has not carried it.

Today's court decision is out of step with the preexisting law of the circuit: not least -- but not just -- <u>Tarver</u>. It bothers me. Defense counsel in <u>Tarver</u>, like the lawyer in this case, concentrated on acquittal and residual doubt. We determined that his acts were not ineffective; but today's court says that counsel in this case was. Cases that are essentially similar – <u>Tarver</u> and this one – ought to have the same result.

I would affirm the judgment of the district court.